STATON et. al. v. WESTERN MACARONI MFG. CO.

No. 3185.   Decided July 9, 1918.   Rehearing Denied Aug. 19, 1918.
(174 Pac. 821.)

1. MUNICIPAL CORPORATIONS—COLLISIONS—DANGEROUS HORSES. In an action for death of a motorcyclist, who collided with a wagon, evidence *held* insufficient to show that defendant's horse had vicious habits, although it was spirited and shied.   (Page 432.)

2. MUNICIPAL CORPORATIONS—COLLISIONS—CONTRIBUTORY NEGLIGENCE. In an action for the death of a motorcyclist, who collided with a wagon on a city street, whether deceased was negligent *held* for jury. (Page 432.)

3. MUNICIPAL CORPORATIONS—COLLISIONS—LAW OF THE ROAD. Although Comp. Laws 1907, sections 1143, 1144, and Laws 1915, c. 80, section 16, do not forbid one traveling upon any part of the road, yet the strongest kind of a presumption of negligence shall be held to prevail against a party whose wagon collided with a motorcycle while on the left side of a city street.   (Page 433.)

4. MUNICIPAL CORPORATIONS—COLLISIONS—NEGLIGENCE—QUESTION FOR JURY. In an action for death of motorcyclist, who collided with a wagon on a city street, whether defendant was negligent *held* for jury.   (Page 434.)

Appeal from Third District.

5. TRIAL—RECEPTION OF EVIDENCE. In an action for death of motor-cyclist, who collided with defendant's wagon, sustaining of plaintiff's objection to a question, "state whether or not, as you saw him, he was usually riding fast or slow," was not error, where defendant did not explain what facts he expected to prove by the witness; purpose of the question being to show deceased's habit of rapid and fast riding. (Page 435.)

6. ANIMALS—HABITS—KNOWLEDGE OF OWNER—PRESUMPTION. Owner of domestic animal for several years is presumed to know its habits. (Page 436.)

7. TRIAL—INSTRUCTIONS—ASSUMPTION AS TO FACTS. In action for death of motorcyclist, who collided with a wagon, instruction that owner of a horse, used in his business, would be presumed to know habit of horse with reference to shying, and, standing alone, was misleading, as carrying the inference that shying was a vicious and dangerous habit. (Page 436.)

8. ANIMALS—DANGEROUS HABTIS—HORSES. Horses are not to be regarded as vicious or dangerous, simply because they have a propensity to shy, and owners are not liable for injuries caused by them, unless they are driven in a place where have no right to be, or the injuries are caused by negligently handling them. (Page 436.)

9. APPEAL AND ERROR—HARMLESS ERROR—INSTRUCTIONS. In an action for death of motorcyclist, who collided with wagon, judgment for plaintiff will not be reversed by reason of an instruction which might mislead the jury to believe that shying was a vicious habit, where the controlling facts in the case were that defendant's horse took fright and shied while being driven on the wrong side of the road. (Page 437.)

10. TRIAL—MISCONDUCT OF COUNSEL. Where trial judge reprimanded counsel for making improper remarks, the making of the remarks will not be given as much weight as if no reprimand had been given. (Page 437.)

11. APPEAL AND ERROR—MATTERS REVIEWABLE—EXCEPTIONS. Where no exception was taken to remarks made before the jury by opposing counsel, the matter will not be reviewed on appeal. (Page 437.)

Appeal from the District Court of Salt Lake County, Third District; *Hon. Wm. H. Bramel,* Judge.

Action by Mrs. Tessa Staton and Fay Staton, an infant, by her guardian ad litem, Mrs. Tessa Staton, against the Western Macaroni Manufacturing Company, a corporation.

Judgment for plaintiffs.   Defendant appeals.   .

AFFIRMED.

*Allen Sanford* for appellant.

*Marioneaux, Straup, Stott & Beck* for respondents.

CORFMAN, J.

This was an action brought in the district court of Salt Lake County by plaintiffs, the widow and minor child of Emmett S. Staton, to recover damages for the death of the latter, caused by a collision between a motorcycle ridden by Staton and a companion and a one-horse delivery wagon driven by an employee of the defendant, upon the streets of Salt Lake City. The accident occurred on the west side of Fourth West street, about fifty-four feet north of the intersection of Fourth West with Fourth South street.   Fourth West street runs north and south.   Fourth South runs east and west.   Fourth South street was paved, but Fourth West was not, except at the intersection, a distance of 132 feet.   Seven railroad tracks run north and south along Fourth West street, occupying the greater portion of the street to the east opposite the point of the accident, so that a space of only about thirty-two feet was available for vehicles on the west side of the street, immediately west of the railroad tracks.   From the portion of the street used by vehicles the ground slopes off into a ditch, and beyond the ditch to the property line on the west was a sidewalk.   At and near the point of accident the portion of the street used for vehicles was practically on a level with the top of the rails of the railroad.   From the top of the rails, inside the track, there was no fill, making a drop of the height of the rails, about five inches.   At the intersection of the streets, near the railroad tracks, at the time of the accident, a concrete crossing was being reconstructed, and the material, concrete and granite blocks used therefor, was piled along the west side of the tracks passing through the intersection of the streets.   The regular cross-

ing over the tracks was torn up, and a temporary plank crossing was used for travel immediately south of the old crossing. In the afternoon of August 31, 1916, immediately before the accident complained of, Staton was riding and driving his motorcycle, a Harley-Davidson machine, with a companion seated on the rear, northerly on Fourth West street; they having but a few seconds before crossed the temporary crossing from the east. At the same time one Salvatore Polidora, an employee of the defendant, was driving the defendant's horse and delivery wagon southerly on the same street, when at a point about fifty-four feet north of the intersection of the said streets the collision between the motorcycle and the delivery wagon took place; the left shaft of the wagon passing clear through the body of Staton, killing him instantly.

The plaintiffs in their complaint charge negligence on the part of the defendant in two particulars: (1) In the said employee carelessly and negligently driving the horse and wagon east of the center line of the street, and failure to keep to the right of the traveled road. (2) Driving an untamed and unbroken animal that was accustomed to shy on the slightest, and without any, provocation. It is alleged in the complaint that, while the defendant's said employee was carelessly and negligently driving the horse and wagon on the wrong side of the traveled road, the horse shied when Staton was about to pass while driving his motorcycle northerly on the east side of the road, thereby causing the shaft of the wagon to be turned in such wise toward Staton, and so suddenly against him, as he rode forward, that the end of the shaft pierced his body and killed him. The answer denies negligence on the part of the defendant and affirmatively alleges negligence on the part of the deceased in driving his motorcycle at an excessive rate of speed, and so that sufficient space was not left between himself and the horse and wagon, and so as to cause the motorcycle to collide with the shaft of the wagon and to cause the shaft to pierce his heart; failure to equip the motorcycle with sufficient brakes in compliance with ordinance of Salt Lake City; and, if so equipped, failure to keep the same in working order, so as to stop the machine within ten feet while running

twelve miles an hour, as required by ordinance. Trial was to a jury, and a verdict returned for the plaintiff. Motion for new trial made and denied. Defendant appeals.

Numerous errors are assigned in the admission and rejection of testimony, permitting plaintiffs to amend their complaint during the progress of the trial, certain conduct of counsel in addressing the jury, the giving of and refusal to give by the trial court of certain instructions, and the denial of defendant's motion for a new trial on the ground that the evidence was insufficient to support the verdict. In his brief and argument the defendant's counsel has grouped the errors assigned and grounds for reversal under four heads: (1) Insufficiency of the evidence to justify the verdict. (2) Exclusion of testimony offered by defendant. (3) Errors of the trial court in giving certain instructions and the refusal to give others. (4) Improper language of plaintiff's counsel in addressing the jury. We shall consider them in the order named.

(a) The circumstances and conditions surrounding and at the scene of the accident were substantially as heretofore stated. The testimony tends to show Polidora was driving the defendant's horse on a slow trot south, as the deceased and a companion were riding the motorcycle north on the same street at a speed of about twelve or fifteen miles an hour. While there is some conflict in the testimony, we think the great weight of the evidence is that Polidora was driving the horse and wagon south, east of the center line of the traveled portion of the street. The deceased and his companion were riding their motorcycle north on the same side of the traveled portion of the street, and as they were thus approaching each other the horse suddenly shied at a wheelbarrow loaded with coiled hose that was being wheeled along the street. The horse, seeing the wheelbarrow, shied or jumped to the east so suddenly that the deceased, then approaching on the motorcycle, was caught on the left shaft of the wagon and his body pierced by it. There were a number of eyewitnesses to the accident. As to the speed of the motorcycle there is much conflict in the testimony. Some of the witnesses for the defendant

testified the motorcycle was running about twenty-five miles an hour when the collision occurred. Others, for the plaintiff, testified it was running only twelve or fifteen miles an hour. The witness Jackson, who was riding the motorcycle with the deceased, and who was probably in a better position than any other witness to inform the court and jury as to the conduct of the deceased in operating and controlling the motorcycle, testified:

"We were going north. When Mr. Staton at first noticed this horse to shy, he shut off his motor; at the same time he signaled with his whistle, at the same time calling to the man to get over on his right-hand side. In doing so, the horse, just as we gets almost to him, he rears and tries to turn to go the same direction we did. One of the wheels of the wagon wouldn't allow him to turn, so he could go north. Instead, he whirls back, and as he whirls back Staton was taken from the machine. * * * The horse was standing practically still, so far as moving south was concerned; * * * he wasn't going south then, * * * not until he shied and whirled back, standing in the air practically on his hind feet. Q. Just at that instant you blew the whistle? A. No; we blew the whistle before that; * * * we blew the whistle at the north part of the intersection, before we got to the dirt road, * * * and applied the brakes at the same time. Q. And the machine was in low gear all the time? A. Low gear—yes, sir."

Again this witness testified, in a somewhat contradictory manner:

"Q. As you went north, where were you when you first observed the horse and wagon? A. At the north part of the intersection, almost just before going on the dirt road. Q. And where was the horse and wagon with reference to the center part of the worn highway or traveled road? A. He had three good quarters of the road. Q. What did Mr. Staton do, immediately after blowing the whistle and getting on the dirt part of the road? A. He then turns off within approximately two or three feet of the track. Q. What did he do with reference to the driver of the vehicle, if anything? A. And after doing that he then calls to the driver, saying, 'For Christ's

sake get over on the right side.' At the same time he shuts his spark and his gas both off. Q. What did you observe the horse to do at that time, if anything? A. At that time? Q. Yes. A. He had done nothing yet, but only just an instant after the horse started to shy. At the same time, then, Staton applied his brakes, and tried to avoid it; but there was no possible chance for him to get out I guess, without going into the track, and there are places there where it is high and where it is low.''

While the testimony of some of plaintiff's witnesses shows that the horse had shied on several occasions when being driven upon the public streets, the testimony of many other witnesses, who were familiar with the animal and who were in a position to observe its habits, was to the effect that the horse did not shy, was well broke, easily controlled, and gentle in disposition. Several disinterested witnesses, some of them girls who had driven the animal, testified that it did not shy, and that they found it easy to manage and control. The undisputed testimony is that the defendant had owned the horse approximately two years before the accident. It had never run away. Polidora, the driver, a man thirty-eight years of age, had been using the horse on the delivery wagon for approximately six months prior to the accident, on the streets of Salt Lake City, delivering goods to and from the railroad stations. During the two years of ownership by the defendant, except for its shying on two or three occasions, the evidence is conclusive that the horse was gentle, easy to manage and control, although a spirited animal. If the horse ever had a vicious habit or propensity, the testimony fails to disclose the fact. The only conclusion to be drawn from the testimony is that the horse was ordinarily dependable and safe.

Polidora, the driver of the horse, so far as the testimony discloses, was exercising due care and had the animal under complete control until immediately before the accident, when it took fright and shied at the wheelbarrow. The evidence is also quite conclusive that when the horse shied at the wheelbarrow it was being driven by Polidora east of the center line, or the wrong side, of the traveled road. Staton

was then east of the center line, on the right side, driving his motorcycle with the purpose of passing the horse and wagon, as he had a perfect right to do. According to the testimony of all the witnesses, the deceased could and would have passed in safety, had the horse not seen the wheelbarrow and shied. We are not prepared to say from the testimony, as disclosed by the record, that the jury was not justified in finding that the deceased was not driving his machine at an excessive speed, that it was properly equipped, or that he failed in any manner to observe the commands of ordinances and statutes in his use and management of the motorcycle while approaching the horse and wagon and in seeking to pass, and that the deceased must be absolved from all negligence in this unfortunate accident.

We are forced to the conclusion, however, that this accident happened by reason of a combination of circumstances, or three concurring causes, viz.: (a) Driving the horse and wagon on the wrong side of the street; (b) frightening of the horse by the wheelbarrow; (c) shying of the horse. Section 1143, c. 3, Comp. Laws Utah 1907, provides:

"Whenever teams of any kind meet, each shall seasonably turn to the right, so as to give the other team half of the traveled road, whenever it can be done with safety."

It is further provided by section 1144 of the same chapter that any person violating the foregoing provision shall be liable for all damages that may accrue to the party by reason of violating the foregoing statutory injunction. Section 16, c. 80, Laws Utah 1915, provides:

"Operators of motor vehicles and motorcycles shall have the same rights upon the public streets and highways as the drivers of other vehicles."

Manifestly our statutes were enacted for the salutary purpose of securing the safety and convenience of all travelers upon public streets and highways. True, the statutes do not forbid one from traveling upon any part of the road which best suits his pleasure and convenience; but, when doing so, he must at all times be regardful of those who are passing or seeking to pass in the opposite direction and "seasonably turn

434        SUPREME COURT OF UTAH.        [Aug.

Staton et al. v. West. Macaroni Mfg. Co., 52 Utah 426.

to the right,'' so. as to give the other half of the traveled road ''whenever it can be done in safety.'' Referring to statutes requiring approaching teams to ''seasonably turn,'' Elliott on Roads and Streets, section 1083, vol. 2, (3d Ed.) says:

''This is held to mean that travelers shall so turn in such season that neither shall be retarded in his progress by reason of the other occupying his part of the way and if one neglects to do it, and an accident follows, an explanation of the occurrence must be given with some presumption against him.''

More especially, we think, the strongest kind of a presumption of negligence should be held to prevail against a party, where, as here, the defendant is found encroaching on that portion of the much-used street of a city assigned by the statute to another.

The defendant's servant, Polidora, was driving the horse toward and nearing a street crossing in a city. The likelihood of others approaching, driving motor cars or motorcycles, from the opposite direction, might momentarily have been expected by any careful and prudent driver. Had        4 Polidora been reasonably mindful of the conditions, his surroundings, and the circumstances that might momentarily arise while he was approaching the crossing, he certainly would have obeyed the command of the statute by keeping to the right of the center line of the road. His failure to do so, under all the circumstances and the events that followed, was sufficient to require the court to submit the question of his negligence to the jury for their determination, and to sustain the verdict of the jury in finding the issues for the plaintiff. We have heretofore pointed out that the testimony before us tends to show that had Polidora driven the horse and wagon on the right side of the traveled road the deceased would have passed in safety. The testimony also tends to show that, if the horse had not taken fright and shied at the wheelbarrow, Staton would have had ample room to pass unharmed, yet the question as to whether the defendant was guilty of negligence or not, in view of the concurring causes and under all the attending circumstances, was for the jury to pass upon. *Neal v. Randall*, 98 Me. 69, 56 Atl. 209, 63 L. R. A. 668; *Hayes v.*

*Michigan C. R. Co.,* 111 U. S. 228, 4 Sup. Ct. 369, 28 L. Ed. 410; *Lake v. Milliken,* 62 Me. 240, 16 Am. Rep. 456; *Ricker v. Freeman,* 50 N. H. 420, 9 Am. Rep. 267; Shearman & Redfield, Neg. section 39a.

(b) Defendant produced a witness, one Butterworth, for the purpose of showing the habit of deceased in riding his motorcycle fast or slow. The trial court sustained an objection made by plaintiff to the introduction of the testimony, to which ruling the defendant excepted, and now assigns error. In support of defendant's contention, counsel has cited the case of *Hodges v. Hill,* 175 Mo. App. 441, 161 S. W. 633, and 2 Thomas on Negligence, p. 1121, where the cases bearing on the admissibility of evidence as to customary acts of participants in personal injury cases are collated. In the Hill Case, cited by counsel, the action was for damage by reason of a collision between the plaintiff's horse and the defendant's horse and buggy driven on the public highway. The error complained of and relied upon in that case for reversal was the admission of testimony, over plaintiff's objection, that plaintiff's son was accustomed to and had the habit of riding the plaintiff's mare along the road where the accident occurred at a rapid rate of speed. The appellate court, after a somewhat exhaustive review of the cases and authorities, held the testimony was proper and admissible as tending to prove the plaintiff's animal was being ridden fast at the time and place of the accident, and as complained of by the defendant.

In this case counsel did not make the offer to show by the witness Butterworth that the deceased was accustomed to riding his motorcycle fast at any time, more especially did he fail to make the offer as to the public street where the accident occurred. After the witness, in answer to counsel's questioning, had stated he lived a close neighbor to and had frequently seen the deceased ride his motorcycle, he was then asked: "And state whether or not, as you saw him, he was usually riding fast or slow." In the absence of an offer of proof on the part of counsel, we are unable to review the ruling of the trial court in refusing to permit the witness to

answer. Counsel should have indicated by the question, or by independent statement to the court, the facts that he expected to prove by the witness. Failure to do so leaves no statement of the facts intended to be proven by the witness.

(c) We have read the instructions of the court to the jury with care and find no prejudicial error in the giving of the instructions, nor in the refusal to give instructions, as complained of by counsel. The principal complaint 6, 7, 8 made in this connection is in the court's giving the following:

"If you shall find that the horse being driven at the occasion of the accident was in the habit of shying without cause or provocation, then the defendant cannot be held responsible, unless it had knowledge of the fact that the horse was in the habit of shying without cause or justification.

*"The owner of a horse used in the prosecution and conduct of his business would be presumed to know the habit of said horse with reference to shying, if said horse had the habit of shying."* (Italics ours.)

The first paragraph of the instruction the court gave at defendant's request. The italicized paragraph was given over defendant's objection, and it is that of which he complains. While we think the owners of domestic animals may be presumed to know their habits, the vice of the instruction as given, without any qualification, might carry the inference to the jury that shying is to be regarded as a vicious and dangerous habit, for which the defendant should be held liable under any and all circumstances. Such is not the law. All horses have a disposition to shy under some circumstances, and many have the propensity to do so with very little, if any, provocation, and yet they are not to be regarded as vicious or dangerous, nor are their owners to be held liable for injuries caused by them, unless they are driven in a place where they have no right to be, or the injuries are caused by negligently handling them. *Lyman v. Dale,* 156 Mo. App. 427, 136 S. W. 760, and cases cited.

In view, however, that the controlling facts in this case were that the defendant's horse took fright and shied while

being driven on the wrong side of the road on a city street under the circumstances heretofore pointed out, we are not disposed to treat the instruction complained of as prejudicial and reverse the judgment on that ground alone.

(d) The complaint made by the defendant of improper conduct on the part of counsel in referring to Polidora, the defendant's driver of the horse, by saying in the presence of the jury, "I don't blame him for leaving Salt Lake City and going where they can't find him," may be regarded as a just and proper criticism of the methods employed by the attorney, Mr. Scott, who, for the time being, must have forgotten the duty he owed to himself, the court, and the litigants before it. Had the trial judge not reprimanded counsel, as he did do, in the presence of the jury, we would be inclined to treat the incident as having a greater weight than we now do in improperly influencing the minds of the jurors and affecting the result of their verdict. However, no exception was noted on the record by opposing counsel; and further, we are convinced that the evidence in this case, as heretofore pointed out, was amply sufficient to sustain the verdict.

Therefore, no prejudicial error appearing in the record, the judgment of the district court must be affirmed. Respondents to recover costs.

FRICK, C. J., and McCARTY, THURMAN, and GIDEON, JJ., concur.