## PEOPLES STATE BANK OF CANNON FALLS v. DRAKE-BALLARD COMPANY.[1]

July 10, 1925.

No. 24, 589.

**Finding sustained that parties compromised their disagreement.**

1. The evidence *held* to sustain findings to the effect that defendant, in order to avoid a suit on the alleged breach of an implied warranty of the validity of certain municipal warrants sold by it to plaintiff, agreed to take such warrants off plaintiff's hands and refund the money paid therefor, if plaintiff would sue the municipality in the courts of the state where located and the decision therein was adverse to plaintiff, and also agreed to reimburse plaintiff for attorney's fees and costs therein.

[1]Reported in 205 N. W. 59.

**Consideration for agreement adequate.**

    2. The consideration for such agreement was adequate and it is not within the statute of frauds.

    1. See Compromise, 12 C. J. p. 366, § 81.

    2. See Compromise, 12 C. J. pp. 324, 327, § 17; Statute of Frauds, 27 C. J. pp. 131, § 18; 146, § 31.

Action in the district court for Hennepin county. The case was tried before Montgomery, J., who ordered judgment in favor of plaintiff. Defendant appealed from an order denying its motion for a new trial. Affirmed.

*Oppenheimer, Peterson, Dickson & Hodgson, Montreville J. Brown* and *E. L. Williams,* for appellant.

  *Selover, Schultz, Mansfield & Bryan,* for respondent.

HOLT, J.

Defendant appeals from an order refusing to amend the findings or grant a new trial.

Plaintiff, a bank, purchased from defendant, a corporation engaged in the business of buying and selling bonds, warrants and other securities, certain warrants issued by the city of Edgeley, North Dakota, paying therefor $4,000, their face value. When the warrants fell due, payment was refused. Plaintiff employed attorneys, and negotiations with defendant took place looking to the recovery of what plaintiff had paid. Defendant concedes that it was agreed that plaintiff, instead of suing it, as threatened, should sue the city of Edgeley in the courts of North Dakota to collect the warrants and that defendant should render aid through the counsel of its attorneys and pay court costs. Such suit was thereafter started in the summer of 1921. The warrants were held void and unenforceable by the court of North Dakota in August, 1922. Thereupon this action was brought on two grounds, viz: That the warrants were sold upon misrepresentation; and that in the negotiations mentioned the agreement was reached not only that plaintiff should bring suit, as stated against the city of Edgeley, but that, in the event of that suit being determined adversely to plaintiff, defendant would then

take the warrants off plaintiff's hands, return to it the money paid for them with interest, and also pay the attorneys' fees expended by plaintiff in the action. The court found no misrepresentations ,in the sale of the warrants, but found the agreement as alleged by plaintiff and ordered judgment accordingly.

As we view the appeal its determination turns on the proposition whether or not the finding alluded to has adequate support in the record. The negotiations between the parties hereto were conducted by Mr. George H. Selover and Mr. Mansfield on behalf of plaintiff and Mr. Hassett representing defendant. After the North Dakota litigation started, Mr. Williams also looked after the interest of defendant to some extent. All were lawyers. Those for plaintiff took the position from the start that the warrants were invalid, demanded that defendant take them back, and threatened suit. Mr. Hassett desired that suit be brought against the city of Edgeley in North Dakota. This is admitted and defendant concedes the negotiations went to the extent of an agreement as first above stated. But Mr. Hassett positively denies that it was agreed that defendant should take the warrants off plaintiff's hands and refund the money received or pay attorneys' fees in the event there was no recovery in the North Dakota suit. Mr. Williams denies he ever met either of plaintiff's attorneys personally before the result of the North Dakota suit was known. Mr. Selover and Mr. Mansfield as stoutly assert that the agreement they made with Mr. Hassett was as found by the trial court. Neither assert with any assurance that Mr. Williams was then present, but claim he was in their office in subsequent interviews concerning the matter. Counsel for defendant frankly stated in the argument that, were there no other evidence than the oral testimony of these four witnesses who represented the parties in these negotiations, this court would not be justified in disturbing the findings. Mr. Selover was not sure of any date. Mr. Mansfield thought the agreement, as claimed by plaintiff, was made in the first part of June, 1921. The court found it was made on May 19, 1921. This likely is an inadvertence of no importance, for a letter of that date from defendant to plaintiff and

a copy thereof mailed to plaintiff's attorneys indicates that no agreement has as yet been concluded, for it contains an offer of aid and court costs. Mr. Selover testified that the agreement was made subsequent to that letter coming to their attention. The suit in North Dakota was started after July 20 and before October 25, 1921, and was decided in August, 1922.

Now the point of defendant's contention that the record does not sustain the finding of the agreement as alleged by plaintiff is this: That, after it was supposed to have been made, Mr. Selover, who testified to participating in making it, wrote two letters, one of date October 25, 1921, and one of date November 5, 1921, which contain no reference thereto—in fact, their tone refutes the existence of any agreement of the sort now claimed. The apparent conflict between the letters and the writer's testimony is explainable only on the theory, inferable from the letters, that some evidence had lately come to the writer's notice which tended to establish a cause of action against defendant for actual misrepresentations inducing the sale of warrants to plaintiff, and that this might prevail on defendant to rescind the sale and refund the money without waiting for the outcome of the North Dakota suit. Mr. Mansfield, who testified most clearly as to the agreement, wrote no letter impeaching his testimony, nor is there anything showing that he knew of the two letters mentioned.

It is to be regretted that attorneys of ripe experience, as all of the four were, should not have reduced the agreement, whatever it was, to writing. But courts have to determine cases upon such evidence as the parties adduce. We are mindful of the fact that the burden of proof was upon plaintiff, and that written evidence is more reliable than that depending upon the recollection of past events apt to be somewhat swayed, though perhaps unconsciously, by interest. And respondent is not aided by the impossible hypothesis advanced that the agreement was made after the two letters were written. Notwithstanding all that, we think there is nothing in the two letters so contradictory of the oral testimony of plaintiff that this court should interfere with the finding of the learned trial

judge.  Anticipating, as plaintiff's counsel clearly did, defeat in the North Dakota suit, their efforts to induce a rescission of the sale on other grounds than the alleged agreement and thus avoid the delay necessarily involved in getting back the money thereunder does not appeal to us as unreasonable.  The evidence sustaining these findings seems to be governed more by the case of Peterson v. Mystic Workers of the World, 141 Minn. 175, 169 N. W. 598, than by Voge v. Penney, 74 Minn. 525, 77 N. W. 422.

We cannot concur in appellant's view that there is either want of consideration for the alleged agreement or that it comes within the statute of frauds.  A good-faith dispute as to the validity of a claim is sufficient consideration for its compromise or settlement. Demars v. Musser-Sauntry L. L. & M. Co. 37 Minn. 418, 35 N. W. 1; Peterson v. Hegna, 158 Minn. 289, 197 N. W. 484.  That a bona fide dispute here existed, we need but point to the able arguments, fortified by numerous authorities, which counsel present pro and con on the proposition of an implied warranty of collectibility and validity arising upon the sale of warrants such as these which on their face do not pledge the general credit of the municipality for their payment.  The avoidance of a lawsuit upon an issue which is uncertain is an adequate consideration, to say nothing of the promise to carry on a suit in the name of the bank against the city of Edgeley to test the validity of an issue of warrants defendant had underwritten and sold.  This included other warrants than those disposed of to plaintiff.  The agreement was not to pay the debt of another and within the statute of frauds.  It was rather in the nature of a rescission of the sale of the warrants made dependent on the contingency of the result of a lawsuit to be undertaken by plaintiff, and out of which defendant expected to derive some benefit and the carrying on of which was of some detriment to plaintiff.  Crane v. Wheeler, 48 Minn. 207, 50 N. W. 1033; Emerson v. Slater, 22 How. (U. S.) 28, 16 L. ed. 360.

In view of the conclusion we reach in respect to the findings of fact, a decision on the point of implied warranty as a basis of recovery is unnecessary and, in a sense, would be obiter, though the able briefs thereon are inviting.

The order is affirmed.

STONE, J. (dissenting.)

I entertain a deep-seated aversion to the manner in which the result is reached. My disagreement is confirmed by the fact that Mr. Justice Holt himself very frankly expresses some misgiving.

It is true that courts, particularly those who try facts "have to determine cases upon such evidence as the parties adduce." But it is none the less judicial duty to weigh evidence as accurately as may be, and an appellate court disregards accepted standards when it sustains a finding which, undeniably, is clearly opposed by a manifest preponderance of the evidence. That is particularly true if the conclusion sustained as against evidence preponderating the other way is favorable to the litigant having the burden of proof. That is so because of the difference between the position of a party who must produce some evidence in order to recover and the one, ordinarily the defendant, who prevails in the absence of any evidence.

In this case it has been found, in favor of the party having the burden of proof, that a very important contract was made. I consider that finding opposed by an overwhelming preponderance of the evidence. For that view the record discloses the following reasons:

1. *The contract was not in writing.* If made, it was made willingly by defendant. It concerned an important matter. Under such circumstances, such contracts, as a matter of sense and business practice, are always in writing, where, as here, the negotiations are conducted by counsel. It may be by informal confirmation—a letter and answer being all that is required to assure those concerned against embarrassment through a loss of or conflict in recollection.

2. *It does not appear satisfactorily that the contract was reported to plaintiff.* If the contract was made, it was the turning point in a very important matter and one marking a distinct success for plaintiff's attorneys. It was such a success for them that, if made, it would have immediately been reported by letter to their out-of-town client. If reported by telephone, it would have been confirmed probably by letter. Yet, there is no letter to that effect in the record nor any suggestion of there ever having been any.

3. *If the contract was made, it would have been acted upon promptly.* Mr. Mansfield said it was made about June 1. He was already in touch with the attorneys in North Dakota who were to conduct the litigation there. The suit was not commenced, apparently, until October. The delay is unexplainable upon any plausible theory and there is no attempt at any explanation of it in the record, at least I have found none.

4. *The commencement of the North Dakota case, when reported· to defendant by plaintiff's attorneys, was not referred to the contract.* Surely it would have been so referred if in fact there had been any such contract. On the contrary, Exhibit P, the letter written by Mr. George H. Selover, of plaintiff's counsel, on October 25, 1921, wherein for the first time he advises defendant of the commencement of the test case in North Dakota, by an implication which seems to me irresistible, negatives the existence of any such contract by its whole text.

The North Dakota case had just been commenced and if a contract had been made the author of Exhibit P participated in its making. How comes it then that the letter not only mentions no contract but, on the contrary, in requesting defendant to take the bonds off the hands of his client, puts his position *solely* on the ground that "We have gone into this matter carefully" with "competent advice in North Dakota" and the consequent "opinion that there is no action that can successfully be maintained to collect these warrants?"

The letter concludes thus:

"We have not intended in this letter to go into any technical questions respecting the Bank's position regarding any claim which it might have or might make against you in this connection; considering that if these warrants were spurious and illegal, the Bank received nothing for its money and as between you and it, should not be permitted to suffer."

Why so much and such general discussion if the North Dakota case had been commenced pursuant to contract? If that procedure

had already been contracted for, why, in the letter advising of its initiation, is there not only silence concerning a contract basis but also a proposal so inconsistent as to negative any such basis?

5. *Certainly no contract was made on May 19, 1921, as alleged in the complaint and found below.* That conclusion is inescapable because: (1) Messrs. Selover and Mansfield disavow that date and; (2) the letter from Mr. Hassett, representing defendant, of May 19 (Exhibit D) negatives the then existence of the contract. It shows further that there was no contract then in contemplation which would relieve plaintiff from *all* of the burden of the proposed North Dakota lawsuit. That letter shows beyond any possible doubt that the object of the negotiations then pending was to interest certain contractors, to the end that *plaintiff* would not have to stand "the *entire* expense" of the attempt to collect from the city of Edgeley. This reference to the then pending efforts to get outside parties to *share* the expense with *plaintiff* certainly negatives the idea of any understanding then existing that *plaintiff* was to be relieved from *all* of the expenses.

The only suggestion, in the record, of May 19 as the date of the supposed contract, is in the complaint. There is not a word of evidence in support. The inference is that, in making the finding that the contract was entered into on May 19, the learned trial judge did not have in mind the evidence. The case was tried on January 10, 1924, submitted on briefs, and not decided until June 24, 1924. It seems to be a case where the press of other and intervening matters has had the effect, on an overworked judge, of confusing the evidence and blurring its effect. The fact remains that the finding of May 19, as the date of the contract, is not only not based upon any evidence but opposed by all of it.

6. *As late as July 6, 1921, no contract had been made.* Hassett's letter of that date (Exhibit F) reports the failure of his efforts to interest the contractors, in the proposed "distribution of expenses," and says that the bank may as well proceed. Proceed how? Proceed under any contract? No—for, if that had been the idea, reference would have been made to the contract.

7. *The letters of plaintiff's attorneys, who were also its only witnesses, negatives the contract.* Mr. Selover's letter of October 25, 1921, to defendant, has been referred to. If there was any contract, it was made long before that letter was written and it is asking too much of reason to suggest that, whether made by Mr. Selover or Mr. Mansfield, the former did not know all about it. What rational deduction is there from his letter except that, at the time it was written, its author had never heard of any suggestion of a contract?

The letter was replied to, under date of October 25, by Mr. Williams for defendant, asking that the matter be postponed until the return of Mr. Hassett, who was out of the city. Under date of November 5 (Exhibit Q) Mr. Selover acknowledged receipt of the Williams letter, and then proceeded to suggest for the first time that his client, plaintiff, had a right to recover on the ground of fraud—an unlikely suggestion if the client was already *assured against loss* by the contract supposed to exist.

There are other letters from defendant to plaintiff's attorneys which continue to refute the claim of contract. Their language makes impossible the conclusion that the parties to the correspondence had then ever heard of the supposed contract upon which recovery is now sought. That is clear because, without any denial from Mr. Selover or Mr. Mansfield, they were told in two letters (Plaintiff's Exhibit J and K) that defendant's "policy" *had not yet been decided upon.* That is true as late as December 17 (Exhibit K). If there had been a contract such as claimed, plaintiff's attorneys are too shrewd and too experienced, both as lawyers and business men, not to have called attention to the fact of its existence and to have suggested that it was a very substantial determination of "policy" and "attitude."

A pertinent concluding observation as to this correspondence is that there is not a word in it to suggest the contract and that, as a matter of common experience, we must conclude that, if it had existed, the contract would have been referred to at least once in some way in so extended a correspondence.

8. *Finally, the explanation in respondent's·brief of the discrepancy between testimony and letters is impossible.* Reference is made to this: "The actual agreement was made a considerable time after the date of that letter (Mr. Selover's of October 25), and in fact *after* all of the letters referred to by appellant written by the firm of Selover, Schultz & Mansfield to the Ballard-Drake Company were written." That statement of plaintiff's attorneys, to this court, is in direct conflict with the testimony of the two 'who furnished their client with the testimony necessary to success. But they proceed with this astounding statement, which cannot stand with the one just quoted: "It is clear from all of the testimony that the agreement was made *before* the test suit was.brought in North Dakota." Any attempt at a reconciliation of the two statements is futile for the plain fact is that the letters now in question, those of October 25, 1921, and subsequent dates, were written, most obviously *after* the North Dakota test case was commenced. So, if the contract was made before the suit was brought, it could not have been after the letters were written.

These facts and inferences, some of them of small and some of great persuasiveness but the whole compelling conviction, explain my disagreement. The majority opinion achieves a welcome result, in that it relieves us from the necessity of deciding the troublesome point (one that might also lead to affirmance), whether, under the circumstances of this case, there was a warranty, express or implied, in connection with the sale of the bonds to plaintiff. Agreement on that point, although not assured, is possible.

It has been a painfully embarrassing thing to discuss, from the standpoint of its credibility, the testimony of two members of our bar. But other high-minded men have been known to be as badly mistaken and similar persistence in honest error is well known to common experience. However, the practice of attorneys of furnishing from their own lips and on their own oaths the controlling testimony for their client, is one not to be condoned by judicial silence. We have had here of late too many cases of it. The good name and deservedly high standing of the Minnesota Bar require

that the practice be stopped, for nothing short of actual corruption can more surely discredit the profession. And their seeming acquiesence, through silence, will as surely discredit judges.

While the embarrassment of the situation is ours, the responsibility for it is not. By appearing in the dual capacity of counsel and witness, and then necessarily by argument urging upon the judge, as trier of the facts, the truth of their own testimony, two of counsel for plaintiff have subjected themselves to the results which automatically attend such a spectacle, for a lawyer "occupying the attitude of both witness and attorney for his client, subjects his testimony to criticism if not suspicion." Ross v. Demoss, 45 Ill. 447 (449). "In most cases, counsel cannot testify for their clients without subjecting themselves to just reprehension." Potter v. Ware, 1 Cush. (Mass.) 519 (524).

There can be no reasonable dissent from the following declaration by a Louisiana judge: "It is always desirable, for the harmony of the profession, the independence of the bench, and the public confidence in the administration of justice, that an attorney should not be a witness, except in extreme cases, when all other means of proof are impossible." Succession of Harkins, 2 La. Ann. 923, 927. See also Onstott v. Edel, 232 Ill. 201, 83 N. E. 806, 13 Ann. Cas. 28; Frear v. Drinker, 8 Pa. St. 520.

There are cases, particularly where an attorney is so much engaged with the affairs of one client as to have acquired a superior knowledge of them, when emergency may compel him to testify and also deny him both right and opportunity of withdrawal. Again, there are occasions when, without impropriety, counsel may testify to an incidental or formal matter such as the identity and genuineness of a document. But the case before us does not fall within any exception to the rule of impropriety, of which there is present so much that in my opinion judicial silence concerning it is not permissible.

My conclusion is that an affirmance cannot be put upon the supposed contract dealt with in the majority opinion. Whether there can be an affirmance upon the ground of warranty, express or im-

plied, we have not attempted to determine. In view of the conclusion of the majority, investigation of that point is uncalled for.

QUINN, J. (dissenting.)

I concur in the dissent of Justice Stone.