[1] Reported in 293 N.W. 90.
This cause comes here for review upon appeal by Annie Healy, sole beneficiary under and proponent of what she claims to be the last will and testament of Minnie E. Stephens, who died a resident of Minneapolis on April 29, 1937. There was a contest filed against its admission by the other heirs at law of decedent based upon (1) lack of testamentary capacity, and (2) undue influence exercised by proponent. At the trial had upon these issues in the probate court the will was sustained against both attacks. On appeal to and trial de novo in the district court before a jury, proponent was sustained on the issue of testamentary capacity, but by a five-sixths verdict the jury found that the purported will was vitiated because of Mrs. Healy's exercise of undue influence in its procurement. Her blended motion for judgment notwithstanding or a new trial was denied. This appeal promptly followed.
Viewing the verdict in the light of the evidence going to sustain it, the jury could find the following facts:
Mrs. Stephens, alleged testatrix, was a divorced and childless woman. (Her age at the time of the alleged will, February 26, 1937, was somewhere between 71 and 81 years. The record disclosed a conflict in this respect. This conflict is not deemed to be determinative of any issue here presented.) At the time of her *Page 599 
death she was survived by a brother (not heard from over a period of several years), five nieces, and three nephews. Three of her nieces reside at Minneapolis, proponent Mrs. Healy, Ida Cole, and Agnes Hartley. Mrs. Cole and Miss Hartley are sisters, daughters of a sister of decedent. All had been on friendly and intimate terms with decedent over a period of years. There apparently was no discord amongst them. In 1933 Mrs. Stephens had suffered a nervous breakdown and left her employment at the Minneapolis General Hospital and took up her residence at a near-by hotel where Mrs. Healy and husband also resided. Mrs. Stephens never returned to work. The Healys later moved to a room adjoining that of Mrs. Stephens. They met and visited daily. Their associations were intimate. The ladies were just "like sisters."
In January, 1937, the manager of the hotel advised Mrs. Healy that Mrs. Stephens would have to leave the hotel. The basis for this request was that Mrs. Stephens' behavior was not deemed conducive to the peace and quiet of other residents of the hotel. Her mental condition was such that the manager deemed it best to consult with Mrs. Healy rather than Mrs. Stephens. Mrs. Healy said she was too busy to find a place for her aunt, referring him to the other two resident nieces and their father, Mr. Hartley. During that month several conversations took place between Mrs. Healy and the mentioned relatives. On the 11th she called at the Hartley home and there discussed over a period of some two hours the manner and means to be employed in the care of Mrs. Stephens. She informed the Hartleys that Mrs. Stephens had lost some or all of her securities and had no idea where they were. They expressed surprise as they had assisted her in securing a safety deposit box the previous summer. Mr. Hartley ventured the suggestion that a will should have been made, but Mrs. Healy thought Mrs. Stephens was in no condition to make a will. There was then on deposit to the credit of Mrs. Stephens in a savings bank in Minneapolis a sizable amount of money, more than $6,000. A statement introduced in evidence indicates that nothing had been withdrawn from this account since October 1, 1934, when the balance was $2,652.28, until February 26, 1937, when $500 was withdrawn. *Page 600 
Interest and other deposit items were added from time to time, but no withdrawals other than the one mentioned had been made.
In view of the supposed loss of Mrs. Stephens' securities, it was suggested that guardianship be sought for her own personal safety, protection, and comfort as well as for the safeguarding of her savings and investments. It was accordingly arranged that the Hartleys should take appropriate steps in that behalf. They talked about where Mrs. Stephens should be placed. A hospital for nervous and mental patients was suggested, and one such was shortly examined by the Hartleys. After this visit several telephone conversations took place, Mrs. Healy wanting to know what was being done and suggesting possible suitable places for Mrs. Stephens. She was informed that an attorney had been consulted. On February 24 or 25, Miss Hartley asked Mrs. Healy if she thought there was any likelihood of Mrs. Stephens' withdrawing any substantial sum of money from the bank. The reply was that she did not know. Miss Hartley said she would consult her attorney and seek his aid to prevent the happening of such event until guardianship could be made effective. She did so and was advised that the bank should be informed of the pending guardianship proceedings so that no substantial sum would be withdrawn. On February 26 Mrs. Healy and decedent went to the bank during the forenoon seeking to withdraw $500. This was not easily accomplished, as the officers of the bank had been informed in respect to the pending guardianship. Mrs. Healy wanted to know if the bank had as yet been served with any notice from the probate court requiring the withholding of payment from Mrs. Stephens' savings account. The reply was in the negative, but nevertheless the money was not then turned over. The two ladies then went to the probate office. A deputy clerk was interviewed. He informed the bank officials that there was no guardianship; consequently the bank turned the money over and charged the withdrawal against the account. This sum was promptly turned over to Mrs. Healy, who already had in her possession $435 in cash admittedly belonging to Mrs. Stephens. There is no *Page 601 
suggestion in the record as to why this very considerable sum of money was needed, nor suggestion made as to its use. Nor is any reason apparent why this money should be carried around by either of them. At any rate, Mrs. Healy was the one in possession of all of it. On the afternoon of the same day they met attorney Hursh while at the courthouse and made an appointment to meet him at his office that afternoon. He was a stranger to both, the elevator operator being the one who introduced them. He was very busy, and the two ladies sat in his office about two hours awaiting his time and convenience to take in hand the business that was to be discussed. He testified at the trial, in fact became a very important witness for the proponent of the will, and in addition actively participated in the trial of the cause,, as well as here on appeal, as her duly retained attorney. His testimony is that when he learned Mrs. Stephens wanted a will made he told Mrs. Healy to leave his private office, so she was not immediately present during the ensuing conversation. His testimony is that there was little in the way of discussion as to the relatives of Mrs. Stephens. One of the principal things discussed, so he says, was the legality of the divorce which had taken place some 25 years theretofore. She did not disclose to him the nature and extent of her property although he asked her about it. "I tried to find out what it [the property] was but she did not refuse to tell me what it was or how much it was but she simply evaded the question." (Her property consisted of cash and securities exceeding $20,000.) The will was dictated by Mr. Hursh, who signed as a witness, as also did his office secretary. It directs (1) that all just debts and funeral expenses be paid, and (2) "I give, devise and bequeath to Annie Healy, my niece, all the rest and residue of my estate, both real and personal, absolutely." Mrs. Healy was appointed sole executrix. The next day, Saturday, February 27, Mrs. Stephens and Mrs. Healy called again at the office of Mr. Hursh. Then for the first time was there discussion with respect to guardianship and the supposed lost securities. He was directed to communicate with the bank on the following Monday. On the same day the probate court appointed *Page 602 
Mr. Hartley special guardian of Mrs. Stephens. The Hartleys called for Mrs. Stephens to take her to a rest home of the Woman's Welfare League in Minneapolis. There, shortly after midnight, Mrs. Stephens became violent. She called for Miss Hartley and Mrs. Cole. She became unmanageable and claimed she had been robbed. Police and relatives were called, also Dr. Meyer, who diagnosed her condition as a mental ailment. Mrs. Stephens was then removed to the Minneapolis General Hospital. There Dr. Lundblad diagnosed her condition as senile psychosis. On the following day Doctors McCain and Blumstein made a similar diagnosis. She remained there until the following Saturday, when she was removed to Vocational Hospital and later to Homewood Hospital, where she was attended by Dr. Lysne and Dr. Dumas, both of whom were of the same opinion as the other medical men in respect to Mrs. Stephens' mental condition. At the trial all medical testimony was to the effect that Mrs. Stephens was and had been over a period of time suffering with senile dementia, an ailment of gradual development. Dr. McCain diagnosed her condition as "Senile Psychosis: Delirious and confused type." Dr. Blumstein, a specialist in nervous and mental disorders, who supervised Mrs. Stephens' treatment from February 28 to March 6, observed that she answered questions in an "unintelligible fashion." He diagnosed her ailment as an advanced case of senile psychosis, defined as a degeneration of the brain cells with permanent injury thereto. The symptoms respecting that ailment are manifested in many ways, such as loss of memory, irritability, suspicion, delusions in respect to loss of property, inability to identify persons, wandering about on well-known premises and yet inability to recognize familiar objects there. As testified to by several lay witnesses, these characteristics manifested themselves in Mrs. Stephens' behavior over a period of considerable time prior to the date of making the alleged will.
1. There is much of other testimony and circumstances that might be related. We think, however, enough has been stated to indicate rather clearly that the issue determined adversely to proponent by the jury finds reasonable support in the evidence. *Page 603 
We have here the mind of one who, because of mental and physical ailments, has been much weakened. Proponent had the unquestioned opportunity of exercising influence upon that mind. That she was so inclined the jury could very readily find. Having thus shown inclination, plus opportunity and, in addition, a result such as we have here, the triers of fact could find undue influence. All other relatives of equal degree of kindred, and toward at least some of whom decedent had always been on friendly and intimate terms, were entirely eliminated. In the accomplishment of that result, so the jury could well determine, there was influence brought to bear upon testatrix' mind by proponent, and such influence was, under the circumstances, "undue influence."
Granting that testatrix had sufficient capacity to make a will (from the present record this seems very doubtful), yet the question of the character of that mind and the degree of mental capacity possessed above the minimum requirements in this respect is obviously of great importance.
"The existence of undue influence in a particular case is to be determined by ascertaining the effect of the influence which was, in fact, exerted upon the mind of the testator, considering his physical and mental condition, the person by whom it was exerted, the time and place and all of the surrounding circumstances; and not by determining the effect which such influence would have had upon the mind of the ordinarily strong and intelligent person." 1 Page, Wills (2 ed.) § 189.
We think the requirements to establish undue influence as outlined in our prior cases were adequately met.
Amongst the many cases to which reference might be made the following are particularly helpful: Fischer v. Sperl, 94 Minn. 421,103 N.W. 502; In re Estate of Keeley, 167 Minn. 120,208 N.W. 535; and In re Estate of Olson, 176 Minn. 360,223 N.W. 677.
2. What has been said disposes of the appeal on its merits. There is, however, another matter which we cannot overlook or *Page 604 
refrain from discussing, much as we would like to avoid so doing. In Ferraro v. Taylor, 197 Minn. 5, 12, 265 N.W. 829,833, we said:
"The practice of attorneys of furnishing from their own lips and on their own oaths the controlling testimony for their client, is one not to be condoned by judicial silence. * * * The good name and deservedly high standing of the Minnesota Bar require that the practice be stopped, for nothing short of actual corruption can more surely discredit the profession. * * * By appearing in the dual capacity of counsel and witness, and then necessarily by argument urging upon the judge, as trier of the facts, the truth of their own testimony, * * * counsel for plaintiff have subjected themselves to the results which automatically attend such a spectacle, for a lawyer 'occupying the attitude of both witness and attorney for his client, subjects his testimony to criticism if not suspicion.' * * * 'In most cases, counsel cannot testify for their clients without subjecting themselves to just reprehension.' " (Citing cases.)
That applies with at least equal force here. When counsel learned that there was a contest to be heard he knew well enough that his testimony in the case was essential to proponent's success. To accept a retainer as her attorney was improper and unlawyerlike in these circumstances. It is to be hoped that no occasion will again arise which will make it necessary further to admonish counsel.
Order affirmed.