JANE HAGERTY v. HENRY J. RADLE AND ANOTHER,
*d. b. a.* RADLE & COMPANY.[1]

May 27, 1949.

No. 34,896.

---

[1]Reported in 37 N. W. (2d) 819.

488

*Doherty, Rumble, Butler & Mitchell,* for appellant.
*Neumeier, Harrigan & Eckberg,* for respondent.

FRANK T. GALLAGHER, JUSTICE.

Appeal from an order of the district court denying the motion of defendant Henry J. Radle for judgment notwithstanding the verdict, a reduction of which was consented to by plaintiff, or for a new trial.

This matter initially involved two actions: One by Jane Hagerty, a minor, by her father and natural guardian, Willard J. Hagerty, for damages for the loss of the fourth and fifth fingers of her right hand caused by the alleged negligence of defendants, Henry J. Radle and Thomas H. Radle, individually and as copartners, in connection with the care and keeping of a stallion; the other by Willard J. Hagerty against the same defendants for medical expenses incurred by him as a result of the accident. The actions were dismissed as to defendant Thomas H. Radle, and the ones we are considering are against Henry J. Radle. For brevity, we shall refer hereinafter to Jane Hagerty, the minor, as plaintiff, and to Henry J. Radle as defendant. In the trial of the actions, the jury found in favor of defendant in the suit brought by Willard J. Hagerty for hospital and medical expenses, and in favor of plaintiff in the action brought on her behalf by her father and natural guardian. The amount of the verdict was $10,000, but the trial court ordered a new trial unless plaintiff should consent to a reduction of the verdict to $8,500, which was done. Defendant, however, did not accept the reduction and took this appeal.

According to defendant's testimony, he purchased Gold Strike, a part palomino Arabian stallion, on April 12, 1945, at South St. Paul and stabled him for a time, commencing May 16, 1945, on the premises of Irving H. Crotton in Stillwater, Minnesota. In August 1945, he was placed in defendant's stable, which is located on the outskirts of Stillwater.

The accident out of which this action arose occurred between 7:30 and 8 p. m. on August 14, 1946, at defendant's stable. On that evening, plaintiff, a young girl about 12 years and 10 months old, who had finished the seventh grade in school, had ridden her horse around the riding path near defendant's stable. For about three years previous to the accident she had attended girls camps during the summertime, where she rode a horse twice a week. In May 1946, her father purchased a horse for her, which she rode practically every evening from the time it was purchased until the date of the accident. At about 7:30 in the evening of the day of the accident, according to her testimony, she took her horse into defendant's barn, where it was being kept at the time, and stabled it herself in a stall in the barn. She said that her father, her mother, Maureen Radle, daughter of defendant, Ruth McGrath, and another girl were present with her in the barn at the time. After tying her horse in its stall plaintiff fed it some sugar. Gold Strike was stabled in a box stall in the same barn near the stall in which plaintiff's horse was kept. Plaintiff testified that after giving her horse some sugar she saw Gold Strike's nose "sniffing around at the bottom of his door so I thought I would give him some sugar." She said that she then "hunched down" on her feet, her knees bent, in front of the door of the stallion's stall, and that "he had his nose poked out there." She said that she had the sugar in the palm of her right hand; that she held it at the bottom of the door and he took it; that she then released her hand and the next thing she knew the stallion reached out, grabbed her hand, and bit it. She said that it was a quick grab and that "he started to pull my hand up under and I sat down and he pulled my hand up under and pulled me into the box stall."

Plaintiff testified on direct examination that the stallion kept hold of her and pulled her left leg to a point about to the knee under the box-stall door and that her arm was pulled under the door to a point halfway up between the elbow and shoulder, causing it to be scraped in the process. When plaintiff's hand was released, she observed that two of her fingers were gone—the record shows the fourth and fifth fingers of her right hand—and that her hand was bleeding. She said that no one had ever told her that she should not go near the stallion's stall; that she did not know there was any danger in going near it; that she did not know that the stallion might bite her. On cross-examination, however, she said that she had fed Gold Strike sugar before, but never in this manner; that she had fed him through a small mesh screen between the upper half of the wood stall and the ceiling by putting sugar on some wood, and that the stallion "had a trick of pushing the wood with his tongue." Further questioned on cross-examination, she said that the stallion took the sugar out of her hand with his lips and released her hand, but that she kept her hand at about the same place in the stall as she had it when she had the sugar in her hand. She said that the stallion took the sugar without nipping or biting her and that she then turned her hand upside down and was moving her fingers, but that she did not hold her hand there very long. She said that when she had fed the stallion on other occasions he had never attempted to bite her and that she had never seen him nip or bite anyone before. She admitted that from her experience with horses, with the large teeth which they have, she knew that if she was not careful she might be bitten.

Plaintiff's father testified that he had been in defendant's barn on several occasions between the middle of 1946 and the date of the trial; that he had observed the box stall occupied by the stallion and that it was located in the southeast corner of the barn; and that there was never any other horse but the stallion in that particular box stall. He claimed that he had observed the horse cribbing and that there had been some effort on the part of defendant to prevent this cribbing; that he saw defendant nail up tin occasionally and

that they had sheepskin there in order to prevent the stallion from cribbing; that the bars on the stall were rounded out and tin had to be put on the edge that had been "chewed"; and that the horse "chewed considerably on the door." He said that he was in defendant's barn on the night of the accident, but that he did not see the accident happen, as he was in the west door and his attention was first called to it when he heard his daughter scream. He said that she was down on her knees as close as she could get to the foot of the door; that his wife, Maureen Radle, Ruth McGrath, and another girl, whom he did not recall, were also present and standing approximately six or seven feet away from the stallion's box stall; and that he immediately took his daughter to the hospital. The finger next to the little finger on her right hand had been pulled out of the socket and the little finger stripped to the first or middle joint.

Plaintiff's mother, Genevieve Hagerty, testified that she was in the barn that night, but did not see the accident, as she was standing to the right of plaintiff, a little ahead of her, across the cement alleyway; that Maureen Radle and Ruth McGrath were standing between her and her daughter; and that her first knowledge of the accident was when she heard her daughter scream.

Maureen Radle, daughter of defendant, testified that she was present at the stable when the accident occurred; that plaintiff had been feeding her own horse in his stall; that while this was going on she (Maureen) was standing by Gold Strike's stall, leaning against it, and had her foot at the bottom of the door; that the stallion noticed her foot, as he looked down there and put his head down and that plaintiff noticed him do this and said, "I think I will give Strike some sugar." Maureen said that plaintiff then bent or stooped down and put her hand "to where Strike was, and then she screamed and jumped back or came back very quick." She could not say how plaintiff was holding her hand, but said that it was underneath the bottom of the door of the stallion's stall. She explained that at the time of the accident the stallion was standing and that his head came down at an angle to the bottom of the door of his stall; that it "was in front beyond the opening," and that she could

see the bottom part of his head through the opening in the door. She claimed that plaintiff's parents were standing in the aisle, not very far behind their daughter, at the time of the accident, and that they were facing Gold Strike's stall. She also claimed that the only persons present at the time were plaintiff, Mr. and Mrs. Hagerty, and herself. She testified that there was bedding in Gold Strike's stall; that part of it was visible outside the stall; and that part of it was in the opening under the door.

There is considerable conflict in the testimony as to the nature and vicious propensities of the stallion. Irving H. Crotton, a man experienced in handling horses for many years, testified that he had kept the stallion for defendant in a box stall in his barn from about April to August 1945; that he had exhibited him at fairs and had managed him for the owner for a time in connection with breeding services. He said that Mr. Radle furnished the lumber for this stall, which was boarded up to seven feet high; that when the door was closed the only place the horse could stick his head out was about 3½ feet up on the left side of the stall. When asked whether the horse was a nervous or gentle one, he replied that so far as a stallion was concerned he would say that Gold Strike was as gentle as any of them, that "there are a lot of stallions that are awful mean. There are a lot of stallions that are gentle. I could wash him, I could crawl under his legs." He said that the animal had "nibbled around" him a few times if he stood at the barn door and that if he slapped him at those times he would stop. He explained that stallions had to be handled more carefully than other horses because they had more life than other horses, and that anybody around stallions should be a little careful, as they are high-strung. "But this particular horse I wouldn't say was too high-strung." He explained that the animal was nervous and that he cribbed a little if he did not have enough exercise; that he would get hold of wood with his upper teeth and would either pull or "take his teeth and push and then grunt for air." He said that he put a little sheepskin around to prevent him from cribbing or biting the wood. He explained an incident at the Bayport fair when he had Gold

Strike there for exhibition purposes. He said that on that particular occasion he came into the barn, after he had "had quite a few drinks of liquor," and that Gold Strike danced around and he whipped him on the front legs to make him behave, because "he was whinnying and prancing, like any horse would lead in that has a little bit of life, and I wanted him to quiet down." He explained that there were also several strange horses stabled in the barn at that same time. He was asked if he had an opinion based on his experience in handling this stallion, as to whether it would be safe for a child to stand near the animal, to which he replied, "I don't think that any horse is safe for any small child." When asked whether the animal would bite, he replied, "I couldn't answer that. He never bit nobody since I had him."

Although called as plaintiff's witness, Crotton denied on direct examination that shortly before the trial he told plaintiff's attorneys that in his opinion it would be dangerous to have anybody near the horse or that the horse had grabbed at him many times, as he explained that Gold Strike "nibbled [at him] with his lips." We quote as pertinent this part of his testimony:

"Q. Didn't you tell us at that time that it wouldn't be safe for any children to be around that stallion—you wouldn't promise—

"A. If I had a stallion there was no children would be around any of them.

"Q. You wouldn't permit them to be around?

"A. Not little children that don't know horses."

On cross-examination, he explained that outside of nibbling with his lips he never saw the stallion kick, bite, or strike at anyone or show any vicious tendencies.

Defendant testified that he was raised on a farm where they always had from four to eight head of horses; that he left home at about the age of 20 and worked in the pineries for seven years, where he drove from four to six head of horses on logging sleighs; that he had had quite a bit of experience with horses; and that until the time of his marriage in 1913 he usually had one or two driv-

ing horses. He explained that he did not have any horses of his own from about the time of his marriage until 1945, although he purchased horses for other people at different times. He bought Gold Strike in April 1945 from Richard Shanahan and before doing so made some tests as to the type of horse he was getting. He claims that his first test was to find out if the animal would bite, by striking him under the chin, and then to find out if he would strike, by giving him a punch in the chest, under the flank, and in the ribs. He made various tests and said that at no time did the stallion attempt to bite, strike, or kick him. He testified that the horse was seven years old in April 1945; that it was part Arabian, but not a thoroughbred, and a palomino in color. After purchasing the stallion, he had him removed to Crotton's stable, where he left him for several months. He said that he helped take care of the stallion during this time, that he was displayed at fairs and shows and was also used for breeding purposes, but that during this time he never saw the stallion attempt to strike, kick, or bite anyone. After removing the animal from Crotton's stable, he took him to his home in Stillwater and kept him in a subbasement from about August 1945 to July 1946; that either he or his daughter Maureen or a helper took care of the animal most of the time; that his son and daughter and some nephews from New York rode the horse; that he never had any trouble with him; and that the horse showed no signs of striking, kicking, or biting. He said that he would take him out and let him graze in the park across from his home and "let kids climb on his back." We quote from his testimony:

"Q. What did you observe the children do in the vicinity of the horse?

"A. Well, a good many of them pulled some grass and handed it to him, and some of them would bring over carrots and apples. I would take it away from them and feed him myself. They were little tots. I never saw any signs of nothing but a very gentle horse.

\* \* \* \* \*

"A. \* \* \* He never made any move to do any striking or kicking or biting the children."

He said that he never encouraged children to pull grass for the horse. "A lot of the kids would flock around there and watch him eat." With further reference to children feeding the stallion, he said:

"Q. You wouldn't let the children up near the horse's mouth?

"A. While I was standing there—yes. I would take the grass and feed it to him.

"Q. You wouldn't let them put their hands up to feed him?

"A. No, sir.

"Q. You accommodated the children and took the grass from them and you fed the horse?

"A. That is right."

Defendant testified that in 1946 he built his own stable, where the accident occurred, and that it was ready for use about the middle of July; that during the course of construction several horses were stabled there, including one owned by plaintiff's father. He said that he took Gold Strike to his stable in July or the early part of August 1946 and that he saw the horse practically every day between then and the date of the accident; that he fed and groomed the animal, put him in his pen, and led him around; that his son, daughter, and others, including plaintiff's father, rode the animal at different times; that the horse handled easily and was very graceful; and that during the times he handled the stallion he never attempted to kick, bite, or strike. He said that Gold Strike was kept in a box stall in the southeast corner of the barn, and he described the stall as being about 9 feet 7 inches x 8 feet 11 inches, and further said:

"The door is three-foot door, built up from the cement floor nine inches—nine inches exactly from the bottom of the cement floor to the bottom of the door, and it goes up five foot nine and a quarter inches. Then there is a space of an inch and a half between the door and a piece of board that is eleven and a half inches wide that extends up to the beam or the joists—the ceiling joists rest on a five foot nine—five-nine—five foot nine inches I got—six two by ten

plank from there up to the ceiling. We have thirty two inches of one inch turkey wire—they call it—one inch mesh—it is square mesh—nailed up so you can't get your hand in there."

He explained that before building his stable he investigated box stalls in other barns, including stables at the University of Minnesota farm school, and he described their construction. He said that he did not know of any standard type of construction for a box stall for stallions, as they varied in the different places he had examined them. He said that they generally kept Gold Strike's stall "well bedded"; that it had a dirt floor; that they used sawdust and straw for bedding; that it extended from three to five inches up from the floor; and that it was the same on the date of the accident as at other times. He testified that when the stallion was in a standing position he could not put his head through the opening at the bottom of the door in his stall and that the only way he could do so would be by lying down flat and pushing his nose through the under part of the door.

On cross-examination, defendant explained the incident at the Bayport fair described by Mr. Crotton in connection with the whipping of Gold Strike. He said that when he arrived at the fair that day Crotton was slapping Gold Strike with a whip and that the "horse naturally was prancing around"; that Crotton was in no shape to ride the horse that day; and that he obtained another rider. He admitted that he had seen Gold Strike bite mares "many times" during the breeding process, but claimed that that was perfectly natural. He described an incident where the stallion was in an enclosure with some Shetland ponies, saying that he "certainly gave them a hard time." When asked to explain this, he said, "Well, he would take after them and chase them and he would nip one or two of them." He said that as a result of this it was necessary to take the ponies out of the pasture. He denied any testimony of plaintiff's father to the effect that he had observed the animal strike at defendant while leading the horse. He admitted that he knew that the horse was a cribber, but claimed that a horse does not bite in cribbing. He said that he fixed up the stallion's box stall in his

barn so that he could not crib. He explained that they did this by making a sort of a round edge on the door by tinning it over so that the animal could not get a firm place for his teeth to pull on, but that the horse finally got "his teeth in one of the corners of the door where the tin was kind of bent down. He kept doing that so much he finally worked on through the tin and then he had a chance to crib."

Several other witnesses, including an employe on another farm, a blacksmith, a rider of the horse, and the wife of Tom Radle, all testified to the effect that the stallion was gentle and that they had never observed it bite anyone.

Norris Carnes testified that he was experienced with horses and livestock generally; that he examined the stallion at the request of the owner shortly after it arrived from Oklahoma; that this included inspection of its eyes and ears and by opening its mouth; that the horse was calm and quiet during this inspection; and it was his opinion that it had a good disposition and was gentle, and that he had never seen it kick, strike, or bite anyone.

Dr. A. A. Connel, a Stillwater veterinarian, testified that he had dressed the horse's teeth once or twice; that it had never attempted to bite and that he had observed no evidence of viciousness in the animal.

It was the opinion of Richard Shanahan, the original owner of the horse after it arrived from Oklahoma, that it was gentle, and he said that during the time he owned the stallion he never heard of it striking, kicking, or biting anyone.

On behalf of plaintiff, Willard J. Hagerty testified, in addition to his claim that the horse was a cribber, that he had also observed places in the stallion's stall where the bars and door had been chewed. He further claimed that defendant had a pasture and exercising pen in connection with the property where the barn was located; that there was a woven-wire fence around this exercising pen; and that he had been at defendant's place quite a number of times before the accident happened when the stallion was in this pen. He described one time previous to the accident when he was

there during the noon hour. He said that the stallion was exercising in the pen, in which there were also three ponies, and that he observed Gold Strike, with his ears straight back, chase these ponies in a vicious manner, biting and lifting whichever pony he caught up with. He claims that he told defendant's son Tom about this. On another occasion, before the accident, he observed the stallion in the pen and said that he was working himself into a constant lather, that a cement block weighing 15 or 20 pounds was tied to a strap seven or eight feet long and connected with the horse's halter, apparently to slow him down, but that it did not do so, and that the stallion kept jerking on the block. He said that on another occasion he was present when the latter was leading Gold Strike and that the stallion made a pass at defendant with his left front foot. Apparently defendant was unaware of this, as the witness said he told defendant about this and that he replied that he did not feel anything. Hagerty also testified that he went out to defendant's barn with plaintiff's attorney during the progress of the trial and that defendant's son Tom was present. Hagerty testified as to the time they were standing near the stallion's stall and he observed Gold Strike, with his ears back, lunge viciously toward the attorney, showing his teeth at the time, and that the horse's teeth struck the wire netting. It was also his recollection that as the attorney walked away the animal turned again and made a similar lunge in the same direction.

E. J. Jansen, operator of a dude ranch near Stillwater, also testified that he had had many years' experience with horses and that he owned a stallion. It was his opinion that in the construction of stalls for stallions they should be closed tight, either all the way or with small openings so that no one could get his hands through them. He said that the type of stallion known as a cribber is a high-strung, nervous type of animal. "I would say all stallions are nervous—high-strung." It was his opinion "that no stallion can be trusted and shouldn't be handled by anything but an experienced handler of that type of horse. They are more or less dangerous." He claimed that the natural tendency of all stallions was to kick

and bite and that it was never good practice to permit children to get near them.

Dr. W. N. Peterson, a Stillwater veterinarian, said that he had never seen Gold Strike, but, after hearing Mr. Hagerty's testimony with reference to observations made by the latter, said that in his opinion the animal was a cribber; "that you have to watch out for those horses more than you do others—they keep biting at things." It was also his opinion that such an animal would be more likely to bite strangers than people it knew.

One of plaintiff's attorneys called as a witness another attorney associated with him in the case, who testified that he and plaintiff's father went to Crotton's place the day before the trial commenced to subpoena the latter as a witness. When the attorney witness was asked what Crotton told him at the time about the horse and how it acted, defendant objected on the ground that the testimony was self-serving and an attempt on the part of plaintiff to impeach her own witness. Plaintiff claimed surprise and asked the witness if Crotton did not then tell him that Gold Strike had bitten him "in his coat sleeve—and that he felt his teeth." The witness said that he did. Defendant moved that the answer be stricken for the purpose of the objection, which the court granted, and made the same objection as to the other question. The court then said, "Well, they claim surprise. * * * For that reason I think it is competent. You may answer." The witness again answered that he did. Plaintiff's attorney then testified that he, plaintiff's other attorney, and her father were at defendant's stable during a recess while the trial was in progress and that Tom Radle, defendant's son, was also present at the time and standing about 10 or 15 feet from them. He explained that the stallion was in the box stall in the southeast corner of the barn, and that the two attorneys walked back there into an open stall next to Gold Strike's stall and looked at the horse through the screen above the board part of the stall. He said that at that time the stallion was standing, looking out the window, facing south; that the horse suddenly turned and lunged toward one of the attorneys and that the horse's ears "went flat back on

his head and he stuck his teeth out." He claimed that he said to Tom, "My God, does he do that all the time?" but that he did not answer. The witness said that when the attorney turned his back the horse again lunged at him in the same manner, showing his teeth. Defendant moved that all testimony with reference to what occurred in the stable at that time be stricken, on the ground that it was solely an attempt by an attorney in the action to corroborate the testimony of one of his own witnesses, Mr. Hagerty, who had also offered testimony to that effect. Defendant argued that the testimony was not offered for impeachment purposes, which plaintiff admitted, but contended that it was offered to show the vicious temperament of the animal. Defendant further argued to the court that it was conduct of the most questionable character to have lawyers go out and obtain evidence and then come in and testify, and plaintiff retaliated by claiming that if a lawyer is a witness he has a right to testify. After considerable argument and discussion in the matter, the court denied defendant's motion to strike the testimony.

Defendant assigns as error:

(1) That the verdict is not justified by the evidence and is contrary to law.

(2) That there is no competent evidence in the case to justify the verdict or the damages awarded to plaintiff.

(3) That the court erred in denying defendant's motion to direct a verdict in his favor at the close of the evidence.

(4) That the court erred in permitting Willard J. Hagerty and John E. Harrigan, one of plaintiff's attorneys, to testify concerning the actions of the stallion observed by them during the course of the trial and in the admission of other evidence.

(5) That the court erred in not granting the motion of defendant for judgment notwithstanding the verdict or for a new trial.

The court charged the jury, among other things, that before plaintiff could recover it must be established (1) by a fair preponderance of the evidence (a) that the horse was vicious or had vicious propen-

sities and (b) that defendant had such notice of the viciousness, actual or constructive, as to put a prudent person on guard; and (2) that the burden of proof rested upon plaintiff to establish not only the viciousness and notice of viciousness of the animal, but also that there was negligence on the part of defendant in the manner in which he kept the stallion and maintained it in the box stall. The court then charged that even though these things were established plaintiff could not recover if the jury found that there was negligence on her part which contributed to the accident.

In Cuney v. Campbell, 76 Minn. 59, 62, 78 N. W. 878, 879, this court said:

"The authorities are all agreed that, in order to render the owner liable in damages to any one bitten by his dog, it must be proved, not only that the dog is ferocious, but that the owner has knowledge of his ferocious nature or propensity. The gravamen of the action is the neglect of the owner of an animal known by him to be vicious, and liable to attack and injure people, to restrain him so as to prevent the risk of damage. And the notice of such propensity must be such as to put a prudent man on his guard. Fake v. Addicks, 45 Minn. 37, 47 N. W. 450, 22 A. S. R. 716."

See, also, Maynard v. Keough, 145 Minn. 26, 175 N. W. 891; Nelson v. American Ry. Exp. Co. 154 Minn. 165, 191 N. W. 405; Maron v. Marciniak, 165 Minn. 156, 205 N. W. 894; Lee v. Seekins, 208 Minn. 546, 294 N. W. 842.

In Rowe v. Ehrmanntraut, 92 Minn. 17, 99 N. W. 211, involving an action for damages for injuries occasioned by a dog biting a person, it was held that it was not error to admit evidence of the animal's propensity to attack other dogs.

We have set forth enough of the evidence in the instant case to show that the questions of the vicious character of the stallion and defendant's knowledge were for the jury. Viewing the evidence in the light most favorable to the prevailing party, as we are compelled to do, we have repeatedly said that a verdict will not be set aside unless it is manifestly and palpably contrary to the evi-

dence. Solosky v. J. A. Johnson Co. 223 Minn. 390, 27 N. W. (2d) 282; 1 Dunnell, Dig. & Supp. § 415.

In the instant case, the evidence with reference to the vicious propensities of the animal, notice to defendant, and neglect on the part of the owner to restrain him so as to prevent the risk of damage was such that it was possible for reasonable men to differ. However, since the verdict is supported by the evidence and is not manifestly contrary to it, in the absence of other errors, it must be affirmed.

█ A review of the court's charge indicates that the question of contributory negligence of plaintiff was fairly submitted to the jury. The court stated in its charge that even though the jury found that the horse was vicious and that the owner had knowledge, actual or constructive, of the viciousness of the animal, and even though they found that defendant was negligent in the manner in which he kept the horse, plaintiff still could not recover if the jury found that there was negligence on her part which contributed to the happening of the accident. While it is true that this court has said that children are more readily excused from a charge of negligence than are adults, this does not mean that in all cases and circumstances a minor cannot be chargeable with negligence as a matter of law. Wineman v. Carter, 212 Minn. 298, 4 N. W. (2d) 83. However, we cannot say in the instant case that the girl involved, although she had finished the seventh grade and was approaching her thirteenth birthday, was guilty of negligence as a matter of law. It appears to us that the question of her contributory negligence was for the jury. 4 Dunnell, Supp. § 7033, states:

"It is only in the clearest cases when the facts are undisputed and it is plain that all reasonable men can draw but one conclusion from them, that the question of contributory negligence becomes one of law for the court. Courts do not sit as a super-jury and their sense of self-restraint should keep them from deciding a question of contributory negligence as one of law except in very clear cases, where the evidence is susceptible of only one reasonable inference."

In Hindal v. Kahler Corporation, 167 Minn. 48, 52, 208 N. W. 524, 526, this court said:

"A minor of the age of 15 years must be expected to exercise some degree of care but the measure of it depends upon his capacity and intelligence, which is ordinarily a question for the jury."

■ Defendant contends that the court erred in permitting plaintiff's father and one of her attorneys to testify concerning the actions of defendant's stallion which they observed during the course of the trial and also in the admission of other evidence.

It appears that on a Sunday morning during a recess of the trial plaintiff's father and her attorneys visited defendant's barn, where the horse was stabled. When the trial reopened the next morning, plaintiff's father was permitted to testify, over objections that it was incompetent, irrelevant, and immaterial and completely remote to the case, as to the actions of the horse which he observed the day before. It will be recalled that Hagerty testified that as he and the attorneys were standing near the stallion's stall the horse, with his ears back and teeth showing, suddenly lunged toward one of the attorneys. The other attorney, who examined and cross-examined many of the witnesses, was permitted to testify, over defendant's objection (1) that Crotton told him the night before the trial was commenced that defendant's horse had bitten his sleeve and that he felt his teeth; and (2) about the incident in the barn on the Sunday morning while the trial was going on with reference to the stallion lunging at one of the attorneys.

In connection with the first incident, plaintiff subpoenaed as a witness Crotton, who had formerly cared for defendant's stallion. At the trial, Crotton denied that he had told plaintiff's father or her attorney that the horse had bitten him in the arm and that he felt the horse's teeth through his coat sleeve. Surprised at this testimony, the court permitted one of plaintiff's attorneys to impeach Crotton in that respect. In view of the fact that the record shows that subsequent to the time plaintiff's attorney had consulted with Crotton and subpoenaed him as a witness for plaintiff Crotton

admitted that people representing defendant had also interviewed him, we see no error in the admission of this testimony, especially in view of the fact that plaintiff claims that Crotton testified contrary to the way he talked with her attorneys when interviewed by them as their witness. It was a matter for the trial court to determine, under the circumstances before it, and there was no reversible error in admitting this testimony. In connection with the second point, defendant objects to one of plaintiff's attorneys testifying as to the incident in the barn on the Sunday during the trial recess, particularly in view of the fact that Hagerty, plaintiff's father, had testified as to this incident. Defendant contends that the testimony of the attorney was merely corroborative.

While the authorities are in conflict as to the admissibility of evidence of viciousness of an animal subsequent to an accident, it has been held in various jurisdictions that such testimony is admissible. See, Annotation, 26 A. L. R. 871.

In connection with such subsequent conduct of fowls and animals, Annotation, 61 A. L. R. 894, states:

"It is held that subsequent conduct of fowls or animals may be admitted as evidence of identity; and, where a person has suffered injuries or damages because of the act of an animal, it is held that subsequent conduct of that animal may be admitted as evidence tending to show a vicious disposition and a fixed habit on the part of the animal," citing cases.

In connection with the above annotation, defendant calls our attention to State v. Staveneau, 158 Minn. 329, 197 N. W. 667, as being cited in support of the rule that subsequent conduct of an animal may not be admitted as evidence. We cannot agree with that contention, as the Staveneau case involved a criminal action where the defendant was found guilty of the crime of stealing chickens as charged in the indictment. This court, in granting a new trial, held that it was improper to receive evidence of experiments or tests with chickens to prove their identity where there was no foundation laid that the chickens had acquired fixed traits

or habits in respect to the subject of the test so that identity might be revealed with some certainty.

An interesting comment by the court in Boatman v. Miles, 27 Wyo. 481, 485, 199 P. 933, 935, 26 A. L. R. 864, is quoted in part in connection with an action against the owner of a stallion:

"* * * It is true that the testimony does not disclose that any manifestations of viciousness prior to June 10th were communicated to the appellant, who claimed that the stallion was gentle. But he had been the owner of it for over a year. It is not likely that the temper of the animal changed over night. The jury had a right to consider common experience. * * * For this reason evidence of viciousness by an animal subsequent to an accident, acting, as it does, according to its natural instincts, is admitted. (Kennon v. Gilmer, 131 U. S. 22, 9 S. Ct. 696, 33 L. ed. 110, and cases cited. Marks v. Lumber Co., 77 Ore. 22, 149 Pac. 1041, Ann. Cas. 1917A, 306; Thornton v. —oyle, 33 Ky. L. 382, 111 S. W. 279, 17 L.R.A. (N.S.) 1233.) And for that reason too, the jury had a right to infer that the stallion in question was vicious long before June 11th, and in view of the fact that the appellant owned it for over a year, and had been its attendant, the jury had the further right to infer that despite the claim of appellant, he was in fact, or should have been, fully apprised thereof. (Hosmer v. Carney, 228 N. Y. 73, 126 N. E. 650; McGovern v. Fitzpatrick, 148 App. Div. 34, 131 N. Y. S. 1048; Lynch v. Richardson, 163 Mass. 160, 39 N. E. 801, 47 A. S. R. 444; Perrotta v. Picciano [186 App. Div. 781, 175 N. Y. S. 16] *supra;* Staton v. Western Macaroni Mfg. Co., 52 Utah 426, 174 Pac. 821.)"

We find no prejudicial error in connection with the admission of this testimony.

■ It is true that this court has called attention in several instances to the impropriety of counsel becoming a witness for his client in a case which he is trying. Peoples State Bank v. Drake-Ballard Co. 164 Minn. 175, 205 N. W. 59; Ferraro v. Taylor, 197 Minn. 5, 265 N. W. 829; In re Estate of Stephens, 207 Minn. 597, 293 N. W. 90. We still strongly admonish against such practice where

the attorney knows in advance of the trial that important testimony —possibly controlling testimony—will have to be provided by him as a witness at the trial. In such a case he should not act as both witness and attorney. However, from a practical standpoint in the actual trial of cases, emergencies can occasionally develop where an attorney may be compelled to testify in order properly to protect his client's interests and assist in the furtherance of justice. Such situations sometimes develop during the course of a trial when it is impossible for the attorney to withdraw from the case without a good deal of expense in connection with starting the trial all over again. In such instances, which are usually rare, it should be clearly within the discretion of the trial court to determine whether the testimony of the attorney should be admissible.

In McKercher v. Vik, 199 Minn. 263, 266, 271 N. W. 489, 491, this court said:

"Plaintiff's counsel testified. This should be avoided, but in this case he may not have realized that his testimony would be material until he had got into the trial. That he was counsel did not make his testimony inadmissible. From the standpoint of the trier of fact it merely went to the weight of the evidence."

In the instant case, if plaintiff's witness surprised her attorneys during the course of the trial and testified contrary to the way he had talked with one of the attorneys when subpoenaed as a witness, and particularly after he admitted a visit with defendant's representatives subsequent to this conference with plaintiff's attorneys, we see no objection to an impeachment of this testimony, as was done here by one of plaintiff's attorneys. With reference to the other incident of corroborating Hagerty's testimony as to what happened in the barn that Sunday, while it might have been more desirable if plaintiff's attorney had not offered this corroborative evidence, it did not create such prejudicial error as to justify a reversal of the verdict.

Affirmed.