# JOHN SORLIE AND OTHERS v. ALMA THOMAS AND ANOTHER.
## ROLF SORLIE, SPECIAL ADMINISTRATOR OF ESTATE OF BELLE BUGGERT, INTERVENER.[1]

February 1, 1952.

No. 35,457.

[1]Reported in 51 N. W. (2d) 592.

510

*Hoffmann, Donahue, Graff & Meier,* for appellant.

*T. Frank Quinn,* for Alma Thomas and Lawrence Ringstad, respondents.

FRANK T. GALLAGHER, JUSTICE.

This action was originally brought by a number of heirs of Belle Buggert, deceased, against two other heirs, Alma Thomas and Lawrence Ringstad, to have certain property transfers made by Belle Buggert during her lifetime set aside on the ground of undue influence. Plaintiffs also asked that defendants be required to make an accounting of all property owned by Belle Buggert at the time of her death, which is now in the possession of defendants. After the action was instituted, Rolf Sorlie, as special administrator of the estate of Belle Buggert, filed a complaint in intervention alleging the same facts and asking the same relief as the original complaint. The case was tried to a jury, which returned a special ver-

dict finding that in each of six transactions Belle Buggert was unduly influenced by defendants. Thereafter, defendants moved for judgment notwithstanding the verdict only. The trial court granted that motion and made findings of fact and conclusions of law and ordered judgment for defendants. Rolf Sorlie, intervener, appeals from the judgment.

Although this case appears to be one which properly might have been tried to the court, defendants' motions at various stages of the proceedings that this be done were all denied.[2] Specific fact questions were submitted to the jury, and its verdict on these questions is as binding on the court as a general verdict in a law action and is subject to the same rules as to setting it aside for insufficiency of evidence. Reider v. Walz, 93 Minn. 399, 101 N. W. 601; see, 15 Minn. L. Rev. 478. To determine whether the trial court erred in granting the motion for judgment notwithstanding the verdict, it is necessary to examine the rules pertaining to the amount of evidence required to sustain a verdict of undue influence.

 The rule ordinarily applicable to test a verdict on motion for judgment notwithstanding the verdict is well stated in Cofran v. Swanman, 225 Minn. 40, 42, 29 N. W. (2d) 448, 450:

"A motion for judgment *non obstante* accepts the view of the evidence most favorable to the verdict and admits every inference reasonably to be drawn from such evidence, as well as the credibility of the testimony for the adverse party, and if the application of this rule, in the light of the evidence as a whole, discloses a reasonable basis for the verdict, the motion must be denied."

It is true that the law imposes a greater burden of proof upon those asserting a claim of undue influence than upon those bearing the burden of proving other fact issues. Borstad v. Ulstad, 232 Minn. 365, 372, 45 N. W. (2d) 828, 832. Thus, a jury is instructed to find undue influence only upon clear and convincing evidence, whereas in other civil cases the instruction is that the burden of proof is satisfied by a fair preponderance of the evidence. The jury in this case

---

[2]See, Rules of Civil Procedure, Rule 39.02, which became effective after this action was tried.

was properly instructed to find undue influence only if the evidence was clear and convincing.

In undue influence cases, even though the fact in issue must be proved to the trier of fact by clear and convincing evidence, this does not change the rule by which the verdict is to be tested either by a court of review or by a trial court upon motion for judgment notwithstanding the verdict. In In re Estate of Mollan, 181 Minn. 217, 219, 232 N. W. 1, 2, where the appeal was from a judgment on a verdict finding that a will was made under undue influence, the court stated the rule:

"The rule is that a finding of the court will not be disturbed on appeal unless manifestly contrary to the evidence; and this rule applies though the fact in issue must be proved by clear and convincing evidence." (Citing cases.)

See, also, Naeseth v. Hommedal, 109 Minn. 153, 123 N. W. 287; Hafner v. Schmitz, 215 Minn. 245, 9 N. W. (2d) 713.

The question now before us, therefore, is whether the evidence presented affords a reasonable basis for the finding of undue influence.

■■■ Albert J. Buggert and his wife, Belle Buggert, lived at 679 Aurora avenue, St. Paul, Minnesota. Immediately prior to the death of Albert, he and Belle, as joint tenants, owned the real and personal property involved in this case. This property consisted of two pieces of real estate in St. Paul; savings accounts Nos. 21794 and 46249 in the First National Bank of St. Paul; savings account No. 57892 in the American National Bank of St. Paul; savings account No. 15952 in the Western State Bank of St. Paul; two real estate mortgages executed by Romeo Bernier and Louisa Bernier; and a promissory note for $1,000, dated May 23, 1944, executed by Robert P. Liesch and wife, payable to Albert J. Buggert or Belle Buggert. The total value of these assets is about $55,000.

Albert Buggert died intestate on September 28, 1946, and was buried on October 1, 1946. On October 5, four days after the funeral, Belle Buggert, then about 83 years old, accompanied by defendants, went to the First National Bank of St. Paul. They first

went to the vault department, where, in the presence of a repre-sentative of the county treasurer's office, a safe-deposit box leased in the names of Albert and Belle Buggert was opened. After this was done and on the same day, they went to the savings department, and Belle transferred accounts Nos. 21794 and 46249, which were then in the name of Albert J. or Belle Buggert, to a new account, No. 223636, in the name of "Belle Buggert &/or Alma Thomas &/or Lawrence C. Ringstad." Later that day, Belle, Alma, and Lawrence went to the savings department of the American National Bank, where Belle transferred savings account No. 57892, which was then in the name of Albert Buggert or Belle Buggert, to a new joint ac-count, No. 99486, in the names of "Belle Buggert or Lawrence C. Ringstad or Alma M. Thomas." On October 7, 1946, Belle, Alma, and Lawrence went to the Western State Bank, where Belle trans-ferred account No. 15952, which was in the name of Albert J. Bug-gert and Belle Buggert, to a joint account in the name of "Belle Buggert or Lawrence C. Ringstad." Apparently the reason Alma Thomas was not included as one of the owners of this account was that the Western State Bank did not permit joint accounts for more than two people.

Some time prior to October 15 or 18, 1946, Lawrence went to the office of Raymond W. Allard, an attorney, and stated that Belle wanted to make out an inheritance tax return, as her husband had passed away. Acting on this information, Allard called on Belle at her home and discussed the inheritance tax problem with her. Allard testified that Belle inquired as to whether a joint tenancy arrangement between herself and someone else would operate the same as it had between her and her husband. Mr. Allard explained the legal effect of joint tenancy to her, and also explained that she could insert in the deeds a reservation of a life estate in herself so that she would receive the rental during her lifetime. Before leav-ing the Buggert home, Mr. Allard asked Lawrence, who was also present at the time, to bring to his office all the information neces-sary to make up the inheritance tax return, which Lawrence did. Thereafter, Mr. Allard prepared two deeds, each covering the two

pieces of real estate owned by Belle. One was a quitclaim deed from Belle Buggert to Katherine F. Allard, and the other was a deed from Katherine F. Allard to Belle Buggert, Lawrence C. Ringstad, and Alma M. Thomas, subject to a life estate in Belle Buggert. On November 1, 1946, Mr. Allard, accompanied by his daughter, Katherine, went to the home of Belle Buggert with the two proposed deeds. Belle executed the deed to Katherine Allard, and Katherine then executed the deed running from her to Belle Buggert, Lawrence Ringstad, and Alma Thomas as joint tenants. Lawrence and Alma were both in the house when these deeds were executed. Although the record is somewhat vague, it seems that two mortgages owned by Belle were also assigned to Lawrence and Alma at the same time. At some later date in November of the same year, the note executed by Robert P. Liesch was assigned to Belle, Lawrence, and Alma as joint tenants.

Alma Thomas and Lawrence Ringstad are brother and sister, and Belle Buggert was their aunt, being a sister of their deceased mother. Except for one Pauline Titerud in Norway, who is also a niece, they were the closest relatives of Belle, the other heirs being grandnephews and grandnieces or even more remote relatives. The record shows that close family ties existed between the Buggerts and defendants. When Alma's and Lawrence's father died in 1914 or 1915, they went to live with the Buggerts. Alma lived there for about ten months and then moved to the home of a cousin. Lawrence continued to live at the Buggert home until April 26, 1918, when he joined the United States navy. Upon leaving for the navy, he placed some of his funds in a joint bank account with Belle. When he returned from the service, he went back to live with the Buggerts, where he remained for about four years. It appears also from the record that the Buggerts and defendants visited back and forth after Alma and Lawrence had established their own homes and that for many years the Buggerts were Thanksgiving day guests at Alma's home.

About a week before Albert Buggert died, Alma went to the Buggert home, where she stayed almost continually until about Octo-

ber 30, 1946. Then she and Lawrence and the latter's wife alternated in staying with Belle until sometime in January 1947, when other arrangements were made for Belle's care. The record also indicates that after her husband's death Belle had come to rely on Lawrence for the handling of some of her business affairs.

A large part of the record contains testimony, much of it conflicting, about the physical and mental condition of Belle, especially about the time the transfers were made. The record shows that she suffered a stroke in 1941, which for a time left her bedridden and affected her mind. Defendants conceded on oral argument that she was mentally incompetent at that time, but contended that she was competent and healthy at the time the transfers were made. Plaintiffs presented testimony that at the time of the transactions Belle was hard of hearing and that her eyesight was poor. Witnesses testified as to her senility, inability to carry on conversations, and forgetfulness. While defendants produced evidence to the contrary, it is our opinion, viewing the testimony in its entirety, that the evidence of her weakened physical and mental condition, coupled with defendants' close contact with her, was sufficient to establish that defendants had an opportunity to exert undue influence and that Belle was susceptible to such influence. However, it is not sufficient merely to show that the person benefited had an opportunity to exercise undue influence. There must be evidence that undue influence was in fact exerted. In re Estate of Mazanec, 204 Minn. 406, 283 N. W. 745.

It is possible that where a real opportunity is shown undue influence might be inferred in a situation where the transactions complained of resulted in a disposition of property in favor of the ones who had an opportunity to influence, while others who would be the natural recipients of deceased's bounty were ignored. In re Estate of Stephens, 207 Minn. 597, 603, 293 N. W. 90, 93. That does not seem to be the situation here. It is apparent from the record that Alma and Lawrence would more naturally have been considered the objects of Belle's bounty than plaintiffs, since they appear to have been closer and more friendly to her and apparently

did more for her than the other relatives. For that reason, if it was necessary to rely upon an inference of the exertion of undue influence from the mere transfer of the property to defendants, the jury's verdict could not be sustained. However, the record contains direct evidence of the exertion of undue influence which affords a reasonable basis for the verdict.

Mabel Cunningham and Myrtle Wardian, both grandnieces of Belle, testified about certain statements made by Alma Thomas while the three of them were returning from an automobile trip to Hastings in September 1947. It appears that they were discussing, among other things, the possibility of the retirement of their husbands. Mrs. Cunningham testified that Alma stated:

"* * * 'Well, Ed [Alma's husband] would like to retire also, but he will have to wait until Auntie passes on', * * * , 'We got my aunt to sign everything over to us; we had a hard time but we had a harder time to get her to sign over the house, but we finally got her to do it.' "

Mrs. Wardian testified that Alma said:

"* * * 'Ed', * * * 'he would like to retire too', * * * 'but you know he won't be able to do it for a while not until Auntie passes away'; * * *, 'You know we got Auntie to sign over everything to us', * * *, 'We had an awful hard time doing it', * * *, 'We had a hard time doing it, but we had a specially hard time to signing the house over,' * * *."

Alma Thomas denied making these statements, but the jury returned a verdict for plaintiffs. Thereafter, defendants moved the court for an order for judgment notwithstanding the verdict only, which motion was granted. The court then made its findings of fact to the effect, among other things, that Alma did not make the statements above set out. Such a finding required a choice between two directly conflicting statements, neither of which is so fantastic as to be unworthy of belief. A choice of this kind can be made only by the body primarily responsible for the determination of fact questions, which in this case was the jury. For the purpose of de-

termining whether the evidence sustains the findings of undue influence, we must assume that the jury found that the statements were made. In the recent case of Employers Mut. Cas. Co. v. C. St. P. M. & O. Ry. Co. 235 Minn. 304, 50 N. W. (2d) 689, it was pointed out that a court may not disregard a jury verdict on specially submitted issues and make findings contrary to or inconsistent with the verdict. (Citing cases.) The court further stated there that such findings made by a jury upon questions of fact submitted to it are not simply advisory, but are as binding on the court as a general verdict.

Ethel Mathisen, wife of one of the heirs, testified as follows to a conversation which she had with Belle in October 1947:

"A. We just went out there and she was crying and starting to hold my hand as she did to everybody, always wanted to be holding somebody and she started to tell me how lonesome she was and about Albert and she says, 'I haven't got anything, they made me sign everything over, but they can't take my home from me' and she was crying and I said, 'What do you mean they had you sign everything over?' and she said—and I said, 'Who?' and she said, 'The man came', and I said, 'Why don't you get the man up here if you are not satisfied with things? Who is he?' and she said, 'I don't know his name.'

"Q. Did she say anything else you recall at that time in that conversation to you?

"A. She says, 'Don't tell my relatives I told you this' she says, 'Because they will treat me meaner than they do; now they have got everything I have got now they don't care about me.'

"Q. Who did you understand her to mean when she said her relatives?

"A. Alma and Lawrence.

"Q. Mrs. Thomas and Mr. Ringstad?

"A. Yes, * * *."

Clara Sorlie, wife of a deceased nephew of Belle Buggert and mother of some of the heirs, testified as follows to a conversation with Belle sometime after the death of Albert:

"A. She was telling me about some papers that they had she had signed and I asked her about that and she said she didn't know what kind of papers it was and I says, 'Well, what kind of papers?' and she says—well, I said 'When' and she says, 'Alma and Lawrence and a man was here', and I says, 'You must know what kind of papers you signed', and she says, 'No, you know Clara I can't hear, they were talking, but I can't hear', she says, 'And you know I can't see well.'

"Q. At that time did Mrs. Buggert say anything else about her property to you?

"A. Yes, she said, 'You know' she says, 'I signed over everything; now all I have got left is my homestead', and she says, 'They can't take that away from me.'"

In our opinion, the evidence as to the exertion of undue influence contained in the testimony set out above affords a reasonable basis for the finding of undue influence. It is true that some of the parties testifying were interested in the outcome of the suit, but the question of the credibility of the witnesses was one for the jury.

■ Inasmuch as defendants did not ask for a new trial in the alternative in connection with their motion for judgment notwithstanding the verdict, they cannot, on appeal, be awarded a new trial. Marquardt v. Hubner, 77 Minn. 442, 80 N. W. 617; Bragg v. C. M. & St. P. Ry. Co. 81 Minn. 130, 83 N. W. 511. However, nothing in this opinion is intended to pass on the question which would be presented to the trial court by a motion for a new trial. See, State ex rel. Olson v. District Court, 196 Minn. 56, 263 N. W. 908.

Reversed.