## MRS. GEORGE (ELIZABETH) AGNER v. MOLLY BOURN AND ANOTHER.

161 N. W. (2d) 813.

September 20, 1968—No. 40,576.

---

386

*Stringer, Donnelly & Sharood* and *R. Paul Sharood,* for appellants.

*Bentson & Kalina, MacLaughlin & Harstad,* and *C. Blaine Harstad,* for respondent.

Heard before Knutson, C. J., and Nelson, Murphy, Otis, and Rogosheske, JJ.

NELSON, JUSTICE.

Defendants, Molly Bourn and John Bourn, appeal from an order of the District Court of Dakota County denying their alternative motions for

amended findings of fact, conclusions of law, and order for judgment, or for a new trial. The action is one for cancellation of a contract for deed or for damages.

If all conflicts in the evidence are resolved in favor of the prevailing party below, the facts appear to be as follows: Plaintiff, Elizabeth Agner, lived with her husband, George Agner, on a 154-acre farm in Dakota County, which they had acquired in the late 1940's. They had two daughters, Elizabeth and Molly. Plaintiff, 76 years of age at the time of trial, was born in Russia and came to this country at the age of 17. The only English she could read or write was her name. Plaintiff's husband passed away at the age of 69 in 1964. Prior to his death, he was afflicted with a brain condition which required surgery at the University of Minnesota Hospitals in 1962. From 1962 on, George was apparently not of sound mind. At the time he was taken ill, plaintiff's older daughter, Elizabeth, and her husband, Joe Seely, were living on plaintiff's farm and defendants, Molly and her husband, John Bourn, were living in Wisconsin.

George was released from University Hospitals after brain surgery March 21, 1963, at which time plaintiff was hospitalized for an operation. During that month the probate court of Dakota County, at her request and with her mother's approval, appointed Elizabeth Seely to be her father's guardian. The petition was resisted by defendants on the grounds that no guardian was needed and that, if one were needed, it should be someone other than Elizabeth Seely, who, it appears, had at one time been hospitalized in Anoka State Hospital.

Plaintiff testified that while her husband was still in the hospital defendants had told her to sell them the farm. She told defendants that it was not for sale and said that defendants threatened to have Elizabeth Seely returned to the Anoka State Hospital. This threat was denied by defendants.

On May 7, 1963, the probate court restored George Agner to capacity and in April 1963 defendants attempted to rent the farm for him. It appears that defendants also obtained tenants and collected the rent. Plaintiff and her husband moved into a trailer house which they purchased and which was located on defendants' farm near Woodville, Wisconsin. On June 13, the day after the trailer house had been purchased, Molly Bourn

drove the Agners from Wisconsin to the Agner farm to pick up the rest of their belongings and John Bourn drove there in his truck. On the return trip, they all stopped in Farmington at the office of an attorney. It appears that defendants and George Agner went into the attorney's office and plaintiff went to have her glasses fixed. After this, she joined the others at the attorney's office. At this time the attorney prepared a contract for deed wherein Elizabeth and George Agner agreed to convey the Agner farm to Molly and John Bourn. There was no earnest money contract or downpayment prior to the execution of this contract for deed. The purchase price was $35,000, which defendants were to pay by assuming a $6,600 mortgage balance and principal payments of $2,700 on the trailer home, with the remaining balance of the contract price to be paid off at $2,500 per year, plus interest. At John Bourn's request the entire contract was read out loud.

Plaintiff testified she did not understand all that was read at that time nor did she know beforehand that the farm was to be sold. John Bourn had called the attorney at Farmington the previous day to make the June 13 appointment and had apparently been in the attorney's office on the morning of the 13th prior to the arrival of Molly, George, and plaintiff, and had directed the attorney to make calls to the Federal Land Bank in Northfield and the Northwestern National Bank in St. Paul. John Bourn paid the attorney for his services. From this date until George's death in 1964 the Agners lived in the trailer house on the Bourn farm.

On June 25, 1963, Molly Bourn took her father to Baldwin, Wisconsin, a town near the Bourns' residence, to see another attorney who had been representing defendants. There George executed a will, leaving all his property to Molly and disinheriting his wife and other daughter.

The nurses' notes indicated that prior to George's discharge from the hospital March 21, 1963, he was not competent; that he showed considerable confusion and forgetfulness; and that he would get lost about the hospital and be unable to find his bed. Plaintiff testified that after George got out of the hospital he was still confused; that he would put his clothes on backwards; that he put his shirt on as if it were his trousers; that he was "going swimming" on the living room floor and took off his clothes to do so; and that he turned the gas stove on, thinking it was the television set.

Plaintiff, from these and other observations, testified that he was not in his right mind.

On October 17, 1963, the proceeds from an auction of the Agners' farm property were deposited in a savings account opened with the Northwestern National Bank in St. Paul in the names of George Agner and/or Elizabeth Agner and/or Molly Bourn. Thus, two signatures were required by the bank to make withdrawals from this account. The account was opened by defendants, but plaintiff did not authorize Molly Bourn to put her name on the account.

On February 18, 1964, John Bourn signed a written listing agreement with Drentlow Realty Company for the sale of the Agner farm at a price of $129,200, calling attention to the large amount of gravel deposits on the land.

On June 25, 1964, George Agner died. On June 26, 1964, John Bourn tendered a check and receipt to plaintiff consisting of the first payment of $2,500, plus interest, on the contract. This check and receipt bore a date of June 22, 1964, which would be prior to George's death. Plaintiff testified that John Bourn told her to take this check or else "I'll take that check and give it to the judge and all you get is $50 a month." She held the check and receipt for two days and then gave both documents back to Molly Bourn. The check was never cashed.

On June 30, 1964, or thereabouts, plaintiff moved out of the trailer house on the Bourn farm and has not returned there since that date.

On December 14, 1964, John Bourn signed a purchase agreement agreeing to sell the 154-acre Agner farm for $131,000. He received and cashed a $500 earnest money check. Both the agreement and the earnest money check were received in evidence. He took the purchase agreement home to Molly, but she refused to sign it. John then had an attorney call the proposed buyers to ask for an additional $150 more per acre. No evidence was introduced to show that plaintiff knew of this purchase agreement, of the listing of the farm for sale, or of any of defendants' efforts to sell the farm prior to the commencement of this lawsuit January 23, 1965.

Plaintiff testified that on June 13, 1963, when the contract for deed was signed, the farm had a value of $100,000, and Raymond MacDonald,

a real estate broker and appraiser, testified that he appraised the Agner farm as of June 13 and found it to have an overall market value of $105,500; that in arriving at his opinion he had considered a gravel report prepared by the Twin City Testing and Engineering Laboratory; and that he himself had also made a physical inspection of the premises.

There was also evidence that prior to George's illness and surgery he had given an option to some party to buy the Agner farm at a figure of $92,400, that defendants were aware of this option as early as 1962, and that defendants were aware of large deposits of commercial gravel on the Agner farm in 1962. Furthermore, defendants signed an agreement to list the farm at $129,000 in February 1964, about 9 months after obtaining the contract to buy it for $35,000, and later entered into a sale agreement in December 1964 to sell the farm for $131,000.

When trial commenced, the court impaneled an advisory jury. The jury was to determine two fact issues—first, whether the contract was the result of undue influence, and second, whether it had been ratified. Upon trial the advisory jury found that (1) Molly and John Bourn induced Elizabeth and George Agner to enter into the contract by means of undue influence; and that (2) Elizabeth and George Agner did not ratify the contract. The trial judge then independently made similar findings and also found that on the date of the contract for deed the farm had a fair market value of between $80,000 and $100,000. As a result, the trial court declared the contract to be null and void, but gave to defendants a lien against the property for any amounts paid by them to third parties under the contract for deed, less any rents and profits received by them under it. On this appeal there is no controversy, as we understand it, relative to the provision for a lien.

The issues appear to be whether the evidence supports the trial court's findings of undue influence and of no ratification of contract.

■ The ultimate fact of undue influence may be and usually is established by circumstantial evidence. Where confidential relations exist between parties and one of them uses the relationship to secure an inequitable advantage, equity will set aside the transaction. Naeseth v. Hommedal, 109 Minn. 153, 123 N. W. 287; Ashton v. Thompson, 32 Minn. 25, 18 N. W. 918; Prescott v. Johnson, 91 Minn. 273, 97 N. W. 891;

Fischer v. Sperl, 94 Minn. 421, 103 N. W. 502; Shevlin v. Shevlin, 96 Minn. 398, 105 N. W. 257.

This court said in In re Estate of Stephens, 207 Minn. 597, 293 N. W. 90:

"The existence of undue influence in a particular case is to be determined by ascertaining the effect of the influence which was in fact exerted upon the mind of the testatrix, considering her physical and mental condition, the person by whom it was exerted, the time and place and all of the surrounding circumstances; and not by determining the effect which such influence would have had upon the mind of the ordinarily strong and intelligent person."

See, also, 19 Dunnell, Dig. (3 ed.) § 9949.

The evidence clearly indicates that from the time of his operation until George Agner's death in June 1964 he remained in poor physical and mental health and was therefore an easy subject for undue influence. Inasmuch as the Agners were living in a somewhat isolated manner on defendants' farm in Wisconsin, defendants were easily able to continue their influence over the Agners' affairs, as might be inferred from Molly Bourn's taking her father to the Bourns' attorney in Baldwin, Wisconsin, where he executed the will leaving all of his property to Molly and disinheriting his wife and other daughter.

It is undisputed that plaintiff was weak-willed, a women of limited intelligence who had never gone to school and was unable to read or write. She herself testified she had always been afraid of John Bourn and his bad temper. The record indicates that Bourn had threatened on more than one occasion that he would send Elizabeth Seely to a mental institution if the farm did not become his. This type of threat would have a continuing effect on a woman such as plaintiff.

Furthermore, during the Agners' stay at the trailer house in Woodville, Wisconsin, they were more ill, aged, and dependent than ever before and defendants a more dominant force in their lives than ever before. The Agners continued to be the same simple, inexperienced, aged, and ill people. Their physical and mental capacities had not increased but on the contrary had diminished. The Agners had no home of their own; they

had no money; they had no old friends; they had no contact with their daughter Elizabeth; they had no telephone; and they were not able to drive a car. They had no independent existence and had to depend upon defendants for their every need.

Of course, it is not sufficient merely to show that the person benefited had an opportunity to exercise undue influence. There must be evidence that undue influence was in fact exerted, but, as noted, this may be shown by circumstantial evidence as well as by direct evidence. While it is true that some of the parties testifying were interested in the outcome of the suit, nevertheless, the question of the credibility of the witnesses was at all times one for the advisory jury and the trial court.

Furthermore, undue influence might be inferred from a disposition of property in favor of the ones who had an opportunity to influence, while others who would be the natural recipients of a share in the property were ignored. In this regard defendants' treatment of plaintiff's daughter, Elizabeth Seely, was no doubt taken into account by the jury in finding the facts as they did. See, In re Estate of Stephens, *supra.*

Some of the factors which the courts will consider in determining whether the grantor's free will has been overcome are his age, intelligence, experience, physical and mental health, and strength of character. Under the facts in the instant case, there is sufficient evidence for the jury to conclude that the contract was inequitable.

Peculiar confidential relations existed between plaintiff and her husband and defendants in the case at bar. It was of such quality that confidence was reposed. The general principle which governs cases of this kind is that if confidence is reposed and that confidence is abused courts of equity will grant relief. Pinger v. Pinger, 40 Minn. 417, 42 N. W. 289. Plaintiff's testimony that defendants repeatedly asked the Agners to sell the farm to them and that defendant John Bourn threatened to have Mrs. Seely returned to Anoka if plaintiff would not sell tends to establish defendants' abuse of the confidence plaintiff placed in them. Defendants argue that this evidence of threats is not clear and convincing.

However, on review, the test of what evidence will suffice is no more nor less than was stated in Hafner v. Schmitz, 215 Minn. 245, 9 N. W.

(2d) 713. There the administratrix of the estate of Emma R. Schmitz brought an action to set aside certain conveyances from decedent to defendant on the ground of undue influence. The trial court found that defendant exercised undue influence over his mother in obtaining the property involved and judgment was awarded setting aside the various conveyances. The only question before this court on appeal was whether the evidence sustained the findings of undue influence, no consideration, and no delivery. We made the following comment, citing several Minnesota cases involving the issue of undue influence (215 Minn. 249, 9 N. W. [2d] 715):

"This court has had many occasions to apply the rules governing cases involving the matter of undue influence. Claggett v. Claggett, 204 Minn. 568, 284 N. W. 363; In re Estate of Stephens, 207 Minn. 597, 293 N. W. 90; Shaughnessy v. Shaughnessy, 135 Minn. 262, 160 N. W. 769. *One of these rules is that where 'confidential relations exist between parties and one of them by means of the relation secures from the other an inequitable advantage, equity will set aside the transaction.'* Claggett v. Claggett, *supra,* at 204 Minn. p. 572, 284 N. W. p. 365; Fischer v. Sperl, 94 Minn. 421, 103 N. W. 502; Naeseth v. Hommedal, 109 Minn. 153, 123 N. W. 287. *The influence must be such that it overcomes the volition of the person influenced.* And the burden of proof is upon the party asserting it. Naeseth v. Hommedal, *supra;* 1 Page, Wills (Lifetime ed.) § 185. *Unless the evidence is conclusive one way or the other, the question is one of fact and, like any other question of fact, is for the jury or trial court.* In re Estate of Stephens, *supra;* Schultz v. Brennan, 195 Minn. 301, 262 N. W. 877; Woodville v. Morrill, 130 Minn. 92, 153 N. W. 131.

"In the instant case the facts hereinabove recited show a confidential relationship; they show an opportunity for the one to take advantage of the other; and an inclination to do so, clearly evidenced by previous attempts. These, together with the result here attained, are sufficient to warrant a finding of undue influence. In re Estate of Stephens, 207 Minn. 597, 293 N. W. 90, *supra.*" (Italics supplied.)

When, in the instant case, the conflicting testimony is viewed in the

light of the circumstances shown and the whole record, specifically with regard to the disparity between the price paid for the farm and its actual worth and also in the light of the fact that George Agner knew its worth, there is sufficient evidence to support the finding of undue influence.

If the Agners were unduly influenced in the spring of 1963 prior to and at the time they sold the Agner farm, they were certainly still under such undue influence from June 1963 until George Agner's death in June 1964. The continuance of undue influence makes ratification impossible. See, Ham v. Potter, 101 Minn. 439, 112 N. W. 1015; Restatement, Contracts, § 499(2); 5 Williston, Contracts (Rev. ed.) § 1626; and 17 C. J. S., Contracts, § 180(c), which states as follows:

"Contracts obtained through the exercise of undue influence are subject to subsequent ratification. However, acts performed while the effects of the undue influence which induced the agreement are still present do not amount to a ratification of the agreement."

See, also, 24 Am. Jur., Fraud and Deceit, § 210.

Ratification being an affirmative defense, defendants had the burden of persuading the advisory jury and the trial court that ratification did take place and in order to prove ratification defendants had the burden of proving that the Agners became fully aware of the transactions in which they had been compelled to enter. Ham v. Potter, *supra*. It may be inferred from the evidence that the Agners did not fully understand or realize how defendants had taken advantage of them and that the court and advisory jury reasonably have found that defendants failed to meet their burden of proof in that regard.

The Agners were not the direct recipients of any of the payments on the contract for deed. Instead, except for the check given to plaintiff June 26, 1964, and returned by her, all payments were made directly by defendants to third parties. The Agners were hardly in a position while living with defendants to intercept or prevent the mortgage and conditional sales contract payments made by defendants. As noted, the trial court in its findings and conclusions specifically provided that all payments made to third parties by defendants, less the rents and profits they had

received, be returned by plaintiff to defendants as a condition precedent to rescission in this case.

Furthermore, the obligations of defendants under the contract for deed were complicated and difficult for persons like the Agners to fully comprehend and understand. Defendants have not shown that the Agners fully understood the details and obligations of the contract.

Additionally, during the year in which the Agners resided in the trailer house before George Agner died, there is no evidence that they learned about defendants' listing agreement of $121,200 or their efforts to sell the farm for prices grossly in excess of $35,000. It is not a case in which the Agners found out that defendants were going to sell the farm for a very high price and then delayed assertion of their rights. Therefore, the burden of proof of ratification was on defendants, who introduced no evidence to indicate that plaintiff ever knew of defendants' activities in selling the farm.

Defendants have argued that plaintiff accepted payment of the 1964 installment in late June 1964. The record shows, however, that after returning the check plaintiff never again demanded it.

From a check of the cases concerning undue influence, it appears that the defense of ratification is seldom raised. Two cases outside of this jurisdiction have, however, clearly passed upon the issue of ratification. In Vicknair v. Trosclair, 45 La. Ann. 373, 12 So. 486, the evidence shows that a woman was induced to convey some of her own real estate to a third party because of a threat by her husband that he would leave her if she did not sign. In finding that there was no ratification the court stated (45 La. Ann. 378, 12 So. 488):

"Some time elapsed before the wife complained of the sale of her interest in the Vicknair plantation. This is urged as one of the defenses to her recovery. If the threat was a fact, it is to be presumed that its effect on the wife will continue so long as the husband and wife live together. The wife would naturally be in constant fear of its repetition and execution if she complained. She was therefore powerless to act until an opportunity presented itself. * * * But her silence cannot prejudice her."

In Union Nat. Bank v. Wright, 79 Colo. 574, 247 P. 453, the Colorado

court considered a similar question. In that case the plaintiff bank was found to have threatened Mrs. Wright that unless she would sign a certain note the bank would send her husband to the penitentiary. At the time of the threat Mrs. Wright was 65 years of age and in poor health. Her husband was 80 years of age. After Mrs. Wright died, the bank sued her estate, claiming she had ratified the note in that she made no objection when the note was renewed and never attempted to cancel it. The court rejected this argument and held (79 Colo. 576, 247 P. 454):

"* * * [W]e think there was no neglect to repudiate which could amount to waiver. If the threat to send Dr. Wright to the penitentiary led Mrs. Wright to sign, it was equally potent to induce her to renew or prevent her bringing an action to cancel. If it ever existed, which we must assume, it was a continuing duress."

Going back to the instant case, if the threats made to plaintiff induced her to sign the contract, such threats would be equally potent to prevent her, as well as her husband who had lost his mental competence, from canceling until a safe opportunity presented itself. That opportunity did not come until after George Agner died and plaintiff left the Bourns' premises for good. Ham v. Potter, *supra,* and Conolly v. Foster, 186 Minn. 8, 242 N. W. 334, cited by defendants, clearly involve circumstances completely different from those of the instant case and no point would be served by reviewing the facts therein.

■ It is recognized that much must be left to the sound judgment of the trial court. We ought therefore not to interfere with the exercise of that judgment unless it is manifestly wrong. This is a case where the trial court might well find that two simple-minded old people had parted with the greater portion of their property for an inadequate consideration and had thereby materially reduced their income for the remainder of their lives, and that those who obtained the property were their trusted advisors who had taken advantage of the confidence reposed in them to benefit themselves materially at the expense of persons who were unable to protect their own interests. Merchants Trust & Sav. Bank v. Schudel, 141 Minn. 250, 169 N. W. 795.

The evidence was sufficient to sustain the findings of the trial court

and advisory jury that defendants exerted undue influence; that it continued; and that there was no ratification. In Leuba v. Bailey, 251 Minn. 193, 202, 88 N. W. (2d) 73, 80, this court in sustaining the lower court held:

"The trial court is the finder of the facts and conflicts in the evidence are to be resolved in that court. This court interferes with the findings of the trial court only where the evidence taken as a whole furnishes no substantial support for them. Where, upon the evidence, reasonable minds might differ as to whether undue influence was exercised by the donee, the findings of the court, based upon a jury's answer to that specific question, may not be disturbed on appeal."

In In re Estate of Olson, 227 Minn. 289, 295, 35 N. W. (2d) 439, 444, we stated the following rule:

"Where the evidence as to testamentary capacity and undue influence is conflicting, findings of the trial court with respect to such questions are final on appeal, even though the appellate court, if it had the power to try the questions *de novo*, might determine otherwise upon reading of the record."

This court in Sorlie v. Thomas, 235 Minn. 509, 511, 51 N. W. (2d) 592, 594, said:

"It is true that the law imposes a greater burden of proof upon those asserting a claim of undue influence than upon those bearing the burden of proving other fact issues. * * *

"* * * [T]his does not change the rule by which the verdict is to be tested * * * by a court of review * * *. * * *

" 'The rule is that a finding of the court will not be disturbed on appeal unless manifestly contrary to the evidence; and this rule applies though the fact in issue must be proved by clear and convincing evidence.' "

We should be guided by the fact that much must necessarily be left to the sound judgment and discretion of the trial court, for it has the advantage not possessed here of seeing and being confronted with all the witnesses, hearing all the testimony, and being assisted by a complete review of all the circumstances surrounding the entire trial. It is under the

circumstances more capable of reaching a broad and clear understanding of the facts. So where the decisive facts found by the trial court are sustained by the evidence, this court need not discuss specifically other proposed findings of fact which would not change the result. 1 Dunnell, Dig. (3 ed.) § 414. This court has made it clear that it is not "within our province, to go into an extended discussion of the evidence to prove or demonstrate the correctness of the findings of the trial court. Rather, our duty is fully performed when we have fairly considered all the evidence and from it have determined that it reasonably supports the findings." Maust v. Maust, 222 Minn. 135, 137, 23 N. W. (2d) 537, 539.

Defendants contend that Molly Bourn exerted no undue influence and seem to imply that if there was any undue influence exerted on plaintiff it was exerted upon her by plaintiff's husband, George Agner. Viewing the record as a whole, it appears to indicate that there is a sufficiency of evidence, both direct and circumstantial, establishing undue influence exerted by both defendants upon plaintiff. Even assuming that plaintiff was unduly influenced solely by her husband who was ailing both physically and mentally, this would not necessarily entitle defendants to prevail.

In a California case, Morris v. Berman, 159 Cal. App. (2d) 770, 324 P. (2d) 601, conveyances by the decedent to his wife, Anne, and stepson, Michael, were invalidated due to undue influence. One of the conveyances to Anne and Michael took place when Michael was 15 years old and did not participate in any way in the procurement of the deed involved. The court, however, held the conveyance invalid as to both Anne and Michael, citing 96 A. L. R. 613, and quoting as follows (159 Cal. App. [2d] 791, 324 P. [2d] 613):

"* * * [A] gift, grant, or bequest procured by undue influence is vitiated thereby, and it is immaterial that in the procurement thereof the immediate beneficiary did not participate."

Likewise, in Moore v. Moore, 81 Cal. 195, 22 P. 589, the evidence showed that shortly after the plaintiff's husband died the brother and a former attorney of the deceased husband combined to unduly influence the wife to convey all of her interest in her deceased husband's property to the stepchildren. The children themselves did not partake in any way

in the exertion of undue influence. Nevertheless, the California court affirmed the cancellation of the conveyances.

In another authority the rule applicable is stated as follows:

"Where a deed was procured by undue influence, it is immaterial that in the procurement thereof the immediate beneficiary did not participate, or that a third person acted with the beneficiary in exercising such undue influence." 23 Am. Jur. (2d) Deeds, § 153.

It would seem under the circumstances disclosed by the record that even if Molly Bourn did not partake in the actual undue influence exerted on plaintiff by her husband she certainly had reason to know that such undue influence was in the process of being exerted on the part of her husband, John Bourn. The record would indicate that neither of them was an innocent grantee. See, Claggett v. Claggett, *supra*.

Defendants on appeal devote a substantial portion of their argument to an attack on the credibility of plaintiff as a witness. However, whether an appellate court is considering the findings of a lower court or the verdict of a jury, it must consider the evidence in the light most favorable to the prevailing party, and the credibility of the witnesses is a matter for the trial court or the jury to determine.

The trial court in the instant case impaneled an advisory jury to which it might submit certain issues of fact. Defendants refused to consent thereto, but the trial court nevertheless submitted certain interrogatories to the advisory jury which it answered by a 10-2 vote as follows:

"1.   Did Molly Bourn and John Bourn induce Elizabeth Agner and her deceased husband, George Agner, to enter into the contract for the sale of their farm by means of undue influence?

"Answer yes or no. *Yes.*

"INSTRUCTIONS: If your answer to question number 1 is 'no', do not answer question number 2. If your answer to question number 1 is 'yes', answer question number 2.

"2.   Did Elizabeth Agner and her husband, George Agner, ratify the contract for the sale of their farm?

"Answer yes or no. *No.*"

The trial court also found that plaintiff and her husband did not at any time ratify or affirm the contract for deed, in effect adopting the findings of the advisory jury, and went on to find and determine that the said sale resulted in undue and unjust benefit and profit to defendants in that the purchase price in said contract for deed was $35,000, providing for no downpayment, and other liberal terms, whereas on the date of said contract for deed the said real estate had a fair market value of between $80,000 and $100,000, and defendants had notice on said date of said market value.

The Rules of Civil Procedure and our own decisions authorize the trial court to use the jury as it did. In Wormsbecker v. Donovan Const. Co. 251 Minn. 277, 87 N. W. (2d) 660, the trial court made findings on the basis of the jury's answers to certain interrogatories. There this court stated (251 Minn. 284, 87 N. W. [2d] 665):

"* * * We can find no cause for complaint on this score. But if anything improper existed in that connection, it is immaterial in view of the fact that the court, in addition to adopting the answers of the advisory jury, also found the same facts on the evidence."

Again in Johnson v. Johnson, 256 Minn. 33, 39, 97 N. W. (2d) 279, 284, where the court accepted as its finding the amount of attorney's fees determined by the advisory jury, we stated:

"* * * Furthermore, the jury acted in an advisory capacity only, and the court was free to accept or reject the verdict as it saw fit."

As has been said in 2B Barron & Holtzoff, Federal Practice and Procedure (Rules ed.) § 891, p. 64:

"* * * The responsibility for decision still remains with the judge. He must prepare findings of fact and conclusions of law when he uses an advisory jury and his exercise of discretion in accepting or rejecting the verdict of the advisory jury is not subject to review. * * *

* * * * *

"There is an occasional suggestion that the findings of an advisory jury should be accepted if they are sustained by the evidence, and are not clearly erroneous. Such expressions are quite contrary to the general

principle that the verdict is advisory only, that the court may accept it or reject it in its unfettered discretion, and that review will be of the findings of court as if there has been no verdict."

See, also, Wright, Minnesota Rules, p. 244; 5 Moore, Federal Practice (2 ed.) § 3910[3]; see, Greenwood v. Greenwood (3 Cir.) 234 F. (2d) 276; (American) Lumbermens Mutual Cas. Co. v. Timms & Howard (2 Cir.) 108 F. (2d) 497; Aetna Ins. Co. v. Paddock (5 Cir.) 301 F. (2d) 807.

On this record it is our view that the findings of the trial court and the jury on the undue influence question and on the ratification question are sustained by the evidence and that there were no compelling reasons for the court to disagree with the advisory jury.

The order of the trial court appealed from herein is affirmed.

Affirmed.