**In re ESTATE OF Grace S. OVERTON, Decedent.**

**No. CX-87-1129.**

Court of Appeals of Minnesota.

Jan. 5, 1988.

James P. Miley, Andrew J. Mitchell, Larkin, Hoffman, Daly & Lindgren, Ltd., Bloomington, for appellant Dr. George Tani.

Harry T. Neimeyer, Stringer, Courtney & Rohleder, St. Paul, for respondents Cretin High School, Salvation Army, Presbyterian Homes of MN, and Shriners Hosp. for Crippled Children.

Neil P. Convery, St. Paul, for the personal representatives of the estate.

Heard, considered and decided by WOZNIAK, C.J., and PARKER and FOLEY, JJ.

## OPINION

PARKER, Judge.

The First Trust Company of St. Paul petitioned the district court for appointment as administrator of Grace Overton's trust and for the probate of her will and codicils. Respondents Salvation Army, Cretin High School, Shriners Hospital for Crippled Children, and the Presbyterian Homes of Minnesota filed an objection to admission of the will to probate, contending that the new will was the result of undue influence.

The Minnesota Medical Foundation, as beneficiary of the will, appeared in support of the will. Dr. George Tani, recipient of two bequests, appeared as a witness. The court admitted the will into probate with the exception of two paragraphs granting bequests to Dr. Tani and the Minnesota Medical Foundation.

Both the Minnesota Medical Foundation and Dr. Tani moved for a new trial; both motions were denied. Dr. Tani appealed to this court and petitioned for discretionary review, as did the Minnesota Medical Foundation. His petition was dismissed as unnecessary and the Foundation's petition was dismissed as untimely. However, a special term panel concluded Tani was "aggrieved" as defined by Minn.Stat. § 525.712 (1986).

The charities offered to restore Tani's bequest and moved again to dismiss his appeal. Tani appeals from the finding of undue influence, but not from the invalidated bequests. We reverse and remand.

## FACTS

Grace Overton died in 1985 at age 98. Childless and a widow of 20 years, she had managed her own funds and died with assets of $600,000. Between 1974 and 1984 she executed 18 wills, codicils and trust agreements, with the assistance of seven different attorneys. All of these instruments left the bulk of her estate to various charitable organizations. Although the names of the organizations varied, the concept of charitable giving was always her intent. It was undisputed that Mrs. Over-

ton was an unusually alert, active and strong-willed person.

Overton's association with Dr. Tani, an opthamologist at the University of Minnesota, began in 1979 when he removed a cataract from one of her eyes. A friendship developed, further surgery followed, and by 1981 Mrs. Overton began to make donations, which Dr. Tani encouraged, to the Minnesota Medical Foundation.

In 1979 Overton wrote her sixth will, leaving the residue of her estate in equal shares to seven charities: the Minnesota Heart Association, Veterans of Foreign Wars, Masonic Memorial Hospital, Shriners Hospitals for Crippled Children, the Salvation Army, the American Red Cross and the American Cancer Society. The previous five wills were quite similar.

Dr. Tani suggested the establishment of a foundation that would memorialize her name at death and, as a result, the Grace Overton Foundation was formed in 1980. During the next four years Mrs. Overton contributed $80,208 to her foundation. In 1980 she changed her will, bequeathing the residue of her estate to her foundation. One year later, another will did the same.

The documents in issue were not created until the summer of 1982, when several wills and a trust agreement named the four respondent charities as beneficiaries. Attorney Christofferson reported in his notes that "she was thinking of changing the residuary clause because she wasn't happy with the way the Overton Foundation was being run; that too much was going to too few individuals." The July and August 1982 trust and will documents were the first and only ones to include Cretin High School and the Presbyterian Homes.

Within six months of their execution, the wills were amended to name the Minnesota Medical Foundation the next residual beneficiary. Two successive amendments a year later, in 1984, reaffirmed that decision. In October 1982 Mrs. Overton told attorney McNeely that she had replaced the four charities with the Overton Foundation at Dr. Tani's urging, but that she did not want that change to be effective. McNeely testified that at a January 1983

meeting attended by Mrs. Overton, Dr. Tani, attorney McNeely and others, "Dr. Tani was to some extent doing the talking and Mrs. Overton was somewhat indecisive as to what she wanted to do. The meeting really ended up by I suggesting that she consider the matter further and make a decision and then advise me."

Later that month Mrs. Overton signed a document she had asked McNeely to prepare leaving the residual to the Minnesota Medical Foundation.

In February 1984 a third amendment to the trust agreement prepared by McNeely was executed; Dr. Tani was not present. That amendment reaffirmed the Minnesota Medical Foundation as the residual beneficiary. A month later, again without Dr. Tani present, Mrs. Overton executed two last testamentary documents prepared by McNeely: a second codicil to her will and a fourth amendment to her trust, dated March 16, 1984. Only these documents included Dr. Tani individually as a beneficiary. The codicil sold him all her household goods for $10,000, forgiving any balance due at the time of her death. The amendment gave Dr. Tani the right to purchase her condominium at market value.

Testimony from various friends, relatives and associates explored at length the relationship between Mrs. Overton and Dr. Tani. It is clear that he saw her socially as well as professionally.

In depositions, both Bernice Johnson, Mrs. Overton's personal banker, and Mildred Johnson, a friend since childhood, testified that Mrs. Overton was flattered by Dr. Tani's attentions and Mrs. Overton told them that Dr. Tani had gone through her chest of drawers to look at her lingerie, to see what women were wearing, since he had not seen his wife's lingerie in a long while.

Bernice Johnson also stated that Mrs. Overton had told her Dr. Tani had once hugged her in his office. Other witnesses, two relatives of the deceased, testified that Mrs. Overton had told them that Tani had tried to kiss her, that sometimes she would lie on the davenport with him and take a little snooze and that Tani had tossed her in the air and caught her, which she thought "kind of cute and kiddish."

The trial court found that Dr. Tani had exerted undue influence over Mrs. Overton in making her wills and therefore invalidated the portions of her will which left the residue to Minnesota Medical Foundation and the gifts to Dr. Tani.

Ten days after that finding, counsel for the charities sent a letter to Dr. Tani stating:

> It is our intention to give to Dr. Tani the full benefit of the one provision of Grace Overton's Will that directly benefited him * * *.

## ISSUES

1. Does Dr. Tani have standing to bring this appeal?

2. Did the trial court err in finding that Dr. Tani unduly influenced Mrs. Overton?

## DISCUSSION

### I

This appeal is brought pursuant to Minn.Stat. §§ 525.71(1) and 525.712 (1986), which authorize an appeal "by any person aggrieved" by a probate court order "admitting or refusing to admit, a will to probate." A "person aggrieved" is one who has been denied some personal property right, or upon whom the appealed order has imposed some burden or obligation. *Gabel v. Ferodowill*, 254 Minn. 324, 336, 95 N.W.2d 101, 110 (1959). The statute uses the word *"person"* aggrieved and not the word *party;* the fact that Dr. Tani was not a party to the underlying action does not disqualify him from bringing this appeal.

When Dr. Tani's appeal was accepted by this court, we stated that Dr. Tani "appears to have a pecuniary interest and to be a person aggrieved entitled to appeal." This presumably prompted the charities to send the letter to Dr. Tani purporting to forgive his debt and to circumvent his standing. This offer, however, presumes that a financial stake is the sole measure of an "aggrieved person's" standing.

Dr. Tani's appeal is not only from the court's refusal to probate the disputed provisions, but also from the finding that he unduly influenced his own patient. He seeks to remove that stigma by reversing that finding. The charities' offer puts Dr. Tani in a peculiar posture; his acceptance would lend credence to the stigma he seeks to remove. He has not accepted the offer.

We have found no cases directly on point on the standing issue. However, we note by analogy that a libel action may be brought in Minnesota and punitive damages recovered for libel per se *without proof of actual damages*. *Loftsgaarden v. Reiling*, 267 Minn. 181, 183, 126 N.W.2d 154, 155 (1964), *cert. denied*, 379 U.S. 845, 85 S.Ct. 31, 13 L.Ed.2d 50 (1964). In *Loftsgaarden* the court offered this rationale:

> The main reason for punitive damages in actions for libel is to deter false, malicious, and provocative attacks upon a person's reputation. The need for such a deterrent is at least as great where the person libeled *cannot show actual loss in money* caused by the false statement as where some measurable damage is provable by the plaintiff.

*Id.* at 182–83, 126 N.W.2d at 154–55 (footnote omitted).

The problem here is the same; the damage is the devastating effect on a person's professional reputation. In *Loftsgaarden* the supreme court recognized that effect on an attorney's professional reputation; here, we recognize the same effect on a doctor's professional reputation. Dr. Tani's aggrieved status flows from the intangible harm resulting to his professional reputation from the finding of undue influence.

## II

This appeal is taken from the finding of fact that Dr. Tani exercised undue influence over a patient's testamentary dispositions. The standard of review is determined by Minn.R.Civ.P. 52.01, which provides:

> Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses.

Undue influence must be shown by clear and convincing evidence. *In re Estate of Reay*, 249 Minn. 123, 126, 81 N.W.2d 277, 280 (1957). That evidence "must go beyond suspicion and conjecture" and must show that the influence "was so dominant and controlling of the testator's mind, that in making the will, [the testator] ceased to act of his own free volition and became a mere puppet of the wielder of the influence." *Id.* at 126–27, 81 N.W.2d at 280.

*In re Estate of Ristau*, 399 N.W.2d 101, 103–04 (Minn.Ct.App.1987), identifies six factors to use in analyzing undue influence, but those factors are not exclusive. The court may also consider the grantor's "age, intelligence, experience, physical and mental health, and strength of character." *Agner v. Bourn*, 281 Minn. 385, 392, 161 N.W.2d 813, 818 (1968).

All the witnesses described Mrs. Overton as an unusually alert and strong-willed person. Bearing this in mind, we then examine the *Ristau* factors to see if we have here:

(1) The opportunity to exercise an influence;

(2) Active participation in the preparation of the will by the party exercising influence;

(3) A confidential relationship between the will-maker and the party exercising influence;

(4) Disinheritance of those who probably would have been remembered;

(5) Singularity of the will provisions;

(6) Exercise of influence or persuasion to make the will in question.

*Id.* at 103–04.

### (1) *Opportunity*

The opportunity to exercise influence existed, for Dr. Tani saw Mrs. Overton both socially and professionally. However, the rule is that a testator may be influenced by others in making the testator's will, but the testator may not be *unduly* influenced. *See In re Estate of Reay*, 249 Minn. at 125–26, 81 N.W.2d at 280. Bernice John-

son encouraged Mrs. Overton's contributions to Cretin High School, yet she received no direct benefit. Friends may naturally lobby for their favorite charities, and such influence is allowed. Grace Overton's cataract surgery personally and directly benefited her. Her resultant gratitude made the Minnesota Medical Foundation a natural object of her bounty, and Dr. Tani as a friend encouraged such charitable donations. Dr. Tani's behavior does not rise to the level of intrusion necessary to render his influence *undue*. We observe that finding # 16 is unsupported by the record:

> The more plausible explanation for her desire to change is that the change resulted from the influence of Dr. Tani which dominated Mrs. Overton * * *.

There are many plausible explanations for the change other than what the court termed Dr. Tani's "domination," most notably her own record of change in the objects of her charity.

### (2) *Active Participation*

Dr. Tani did not participate in the preparation of the testamentary documents admitted to probate. They were prepared by an experienced probate attorney. The record shows the attorney handled the preparation of the will in a responsible fashion. We find no support in the record for finding # 18 that Dr. Tani was "actively involved in the preparation of the documents that led to the change of Mrs. Overton's will and trust."

Documents that were prepared in Dr. Tani's office were not admitted to probate; furthermore, there is no evidence that he was personally involved in their preparation. Mrs. Overton kept a desk in Dr. Tani's office and could either have typed the documents herself or requested that the secretary do so. Finding # 18 assumes a damaging fact which is without support in the evidence and must therefore be stricken.

### (3) *Confidential Relationship*

A confidential, doctor-patient relationship existed between Dr. Tani and Mrs. Overton; however, the trial court went further and found that he "perpetuated a confusing mixed relationship of professional care,

friendship, *and romantic feelings*" (emphasis supplied). Evidence supporting this claim is found in the deposition testimony of Bernice Johnson and Mildred Johnson, who spoke of hearsay conversations about the hug and the lingerie incidents.

Bernice Johnson characterized Mrs. Overton's stories as "fantasies" and Mildred Johnson testified to Grace Overton's occasional "hallucinations." Most important, the record is devoid of any evidence whatsoever that Dr. Tani was aware of her "fantasies."

Proof that Dr. Tani was aware of these fantasies is essential to the court's conclusion that he perpetuated such feelings. The court, however, merely assumed this fact in finding # 22, stating that Dr. Tani "must obviously have been aware of the effect he was having on Mrs. Overton." Thus, the trial court leaped to a crucial conclusion which is without substantial basis in the record. It certainly was not established by the required clear and convincing evidence.

### (4) *Disinheritance*

The four charities argue they are the ones which Mrs. Overton would have remembered, but that Dr. Tani induced their disinheritance. However, Mrs. Overton made statements to her trust officer and to her attorney explaining the change, stating that she had given enough money to those organizations.

The four charities' objections effectively denied a gift to the Minnesota Medical Foundation, the charity she had most favored during her lifetime. The court gave credence to the only testamentary document naming Cretin High School and the Presbyterian Homes of Minnesota, yet three such documents named the Minnesota Medical Foundation. There was no showing that the four charities were more appropriate recipients of her bounty than was the Minnesota Medical Foundation.

### (5) *Singularity*

The charities argue that Mrs. Overton had originally devised her household furnishings to her husband's nephew, Daniel Miller, in seven different wills and one codi-

cil. By the second and last codicil she instead sold those furnishings to Dr. Tani, ending a long-established pattern. Those goods were valued at approximately $5,600, and Daniel Miller was, then, for the first time bequeathed $10,000 in cash, a sum in excess of the value of the household goods. The household goods comprised a small part of her $600,000 estate. Under these facts, arriving at a conclusion of singularity is unwarranted.

### (6) *Exercise of Influence*

Undue influence *"must operate at the very time the will is made."* In re Estate of Marsden, 217 Minn. 1, 9, 13 N.W.2d 765, 770 (1944) (emphasis in original). The testamentary documents were prepared by an attorney retained by Mrs. Overton. The charities complain of documents prepared with Dr. Tani's involvement; however, the criticized documents bequeathed the residual to the Overton Foundation and were not admitted into probate. Dr. Tani was present at the execution of only one of the earlier documents and, when he spoke, attorney McNeely took careful steps to ensure that the drafted document reflected only Mrs. Overton's desires, halting the conference until she could speak for herself. At trial McNeely testified to Mrs. Overton's intent:

Q: Did she ever complain to you of the bequest to the Minnesota Medical Foundation, or indicate any hesitancy about it?

A: None whatsoever.

Q: Did she at any time indicate that it was anything other than her firm desire that they get that money?

A: No, she never had any doubts whatsoever about it.

In the face of this unimpeached testimony of an experienced and diligent attorney, a finding of undue influence would require powerful evidence, which is not revealed by our scrutiny of the record. Dr. Tani was not in a position to dominate and control the making and execution of the documents admitted to probate.

## DECISION

Appellant is an aggrieved person under Minn.Stat. § 525.712 (1986) and has standing to bring this appeal. The trial court erred in finding that appellant unduly influenced the decedent; we order stricken finding # 18, the first three sentences and last two sentences of finding # 22, and conclusion of law # 25.

Reversed and remanded.